Matthew Sharp, Esq.
Nevada Bar No. 4746
432 Ridge St.
Reno, NV 89502
(775) 324-1500
matt@mattsharplaw.com

Steven K. Eisenberg, Esq.
*Pro Hac Vice to be filed*
**STERN & EISENBERG, P.C.**
1581 Main Street, Ste. 200
Warrington, PA 18976
 (215) 572-8111
seisenberg@sterneisenberg.com

*Counsel for Plaintiff, Fresh Mix LLC*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| FRESH MIX, LLC<br>        Plaintiff<br><br>vs.<br><br>PISANELLI BICE, PLLC, a Nevada Law Firm and Professional Limited Liability Company, JAMES P. PISANELLI, ESQUIRE, an individual, DEBRA L. SPINELLI, ESQUIRE, an individual, COHEN DOWD QUIGLEY PC, an Arizona Law Firm and Professional Corporation, RONALD J. COHEN, an individual, BETSY LAMM, an individual, DANIEL QUIGLEY, an individual, BRUCE A. LESLIE, CHTD, A Nevada Firm, BRUCE A. LESLIE, an individual; BROWNSTEIN HYATT FARBER SCHRECK LLP; a Colorado Limited Liability Partnership; SAMUEL A. SCHWARTZ, an individual, and SCHWARTZ LAW, PLLC, and ZACHARIAH LARSON, an individual , and LARSON & ZIRZOW, LLC and DOES 1 through 25; and ROE BUSINESS ENTITIES I through X, inclusive<br>        Defendant(s) | Case No:<br><br>**COMPLAINT FOR**<br>1.  **Punitive Damages and Sanctions**<br>2.  **Legal Malpractice**<br>3.  **Negligence**<br>4.  **Breach of Fiduciary Duties**<br>5.  **Fraud**<br>6.  **Intentional Misconduct/Malice**<br>7.  **Vexatious and Dilatory Conduct (28 U.S.C. §1927 and F.R.B.P. 9011)**<br>8.  **Bad Faith (11 U.S.C. §303(i))**<br>9.  **Racketeering Influenced and Corrupt Organization (18 U.S.C. §§1961, et. seq.)**<br><br>**JURY DEMANDED** |

COMES NOW, Plaintiff, FRESH MIX, LLC (the "Fresh Mix"), a Delaware limited liability company, as Plaintiff, by and through its counsel, MATTHEW SHARP, ESQUIRE, Nevada Licensed Counsel, and STEVEN K. EISENBERG, ESQUIRE (Pro Hac Vice Pending) of STERN & EISENBERG, PC, and brings claims against the Defendants, PISANELLI BICE, PLLC ("PB"), a Nevada Law Firm and Professional Limited Liability Company, JAMES J. PISANELLI, ESQUIRE ("JJP"), an individual, DEBRA L. SPINELLI, ESQUIRE ("DLS"), an individual, AVA SCHAEFER, ESQUIRE ("AMS"), an individual (PB, JJP, DLS, AMS are collectively referred to as "PB" and/or "PB Defendants"), COHEN DOWD QUIGLEY, PC ("CDQ"), an Arizona Law Firm and Professional Corporation, RONALD J. COHEN, ESQUIRE ("RJC"), an individual, BETSY LAMM, ESQUIRE ("BL"), an individual, DANIEL QUIGLEY, ESQUIRE ("DQ") (CDQ, RJC, BL and DQ are collectively referred to as "CDQ" and/or "CDQ Defendants"), an individual, BRUCE A. LESLIE, CHTD ("Leslie Chartered"), a Nevada Professional Corporation, BRUCE A. LESLIE, ESQUIRE ("BAL") (Leslie Chartered and BAL are collectively referred to as "BAL", "Leslie" or "BAL Defendants"), SCHWARTZ LAW, PLLC ("SL"), a Nevada Law Firm and Professional Limited Liability Company, SAMUEL A. SCHWARTZ, ESQUIRE ("SAS" and/or "Schwartz"), and individual (SL and SAS are collectively referred to as "SAS", "Schwartz" and/or  "SL Defendants"), and BROWNSTEIN HYATT FARBER SCHRECK LLP ("BHFS"), a Limited Liability Partnership conducting business in the State of Nevada (the PB Defendants, CDQ Defendants, BAL Defendants and SL Defendants and BHFS are collectively referred to as the "Defendants") and ZACHARIAH LARSON ("Larson"), an individual and LARSON & ZIRZOW, LLC, a Nevada Limited Liability Company ("LZ", jointly referred to with Larson as "Larson" or "LZ") and alleges the following:

///

**GENERAL ALLEGATIONS APPLICABLE**
**ALL CAUSES OF ACTION**

**<u>PARTIES</u>**

1.      Plaintiff in this matter is FRESH MIX LLC ("Fresh Mix") a Delaware Limited Liability Company formerly with its principal place of business in Las Vegas, Nevada.

2.      Fresh Mix is informed, believes and thereupon alleges that Defendant, PISANELLI BICE PLLC is and was at all relevant times a Nevada Professional Limited Liability Company formed and conducting business in the State of Nevada, more specifically in Las Vegas, Nevada. PB is responsible for the acts and conduct of its partners, attorneys, employees and/or agents.

3.      Fresh Mix is informed, believes and thereupon alleges that Defendant, JAMES J. PISANELLI, ESQUIRE is and was at all relevant times an individual, attorney licensed to practice law, conducting business in the State of Nevada, more specifically in Las Vegas, Nevada.  At all relevant times, Pisanelli has been a partner with the law firm of Pisanelli Bice PLLC.

4.       Fresh Mix is informed, believes and thereupon alleges that Defendant, DEBRA L. SPINELLI, ESQUIRE is and was at all relevant times an individual, attorney licensed to practice law, conducting business in the State of Nevada, more specifically in Las Vegas, Nevada.  At all relevant times, Spinelli has been a partner with the law firm of Pisanelli Bice PLLC.

5.      Fresh Mix is informed, believes and thereupon alleges that AVA SCHAEFER, ESQUIRE is and was at all relevant times an individual, attorney licensed to practice law, conducting business in the State of Nevada, more specifically in Las Vegas, Nevada.  At all relevant times, Schaefer was an attorney with the law firm of Pisanelli Bice PLLC.

6.      Fresh Mix is informed, believes and thereupon alleges that Defendant, COHEN DOWD QUIGLEY PC is and was at all relevant times an Arizona Professional Corporation formed in the State of Arizona and conducting business in the State of Nevada, more specifically

in Las Vegas, Nevada. CDQ is responsible for the acts and conduct of its partners, attorneys, employees and/or agents.

7.     Fresh Mix is informed, believes and thereupon alleges that Defendant, RONALD J. COHEN, ESQUIRE is and was at all relevant times an individual, attorney licensed to practice law, conducting business in the State of Nevada, more specifically in Las Vegas, Nevada.  At all relevant times, Cohen has been a partner with the law firm of Cohen Dowd Quigley PC.

8.     Fresh Mix is informed, believes and thereupon alleges that Defendant, DANIEL QUIGLEY, ESQUIRE is and was at all relevant times an individual, attorney licensed to practice law, conducting business in the State of Nevada, more specifically in Las Vegas, Nevada.  At all relevant times, Quigley has been a partner with the law firm of Cohen Dowd Quigley PC.

9.     Fresh Mix is informed, believes thereupon alleges that Defendant, BETSY LAMM, ESQUIRE is and was at all relevant times an individual, attorney licensed to practice law, conducting business in the State of Nevada, more specifically in Las Vegas, Nevada.  At all relevant times, Lamm has been a partner with the law firm of Cohen Dowd Quigley PC.

10.     Fresh Mix is informed, believes and thereupon alleges that Defendant, BRUCE A. LESLIE, CHTD is and was at all relevant times a Nevada Professional Corporation formed in the State of Nevada and conducting business in the State of Nevada, more specifically in Las Vegas, Nevada. Bruce A. Leslie, Chtd. is responsible for the acts and conduct of its partners, attorneys, employees and/or agents.

11.     Fresh Mix is informed, believes and thereupon alleges that Defendant, BRUCE A. LESLIE, ESQUIRE is and was at all relevant times an individual, attorney licensed to practice law, conducting business in the State of Nevada, more specifically in Las Vegas, Nevada.  At all relevant times, Leslie has been a partner with the law firm of Bruce A. Leslie Chtd.

12.     Fresh Mix is informed, believes and thereupon alleges that Defendant,

BROWNSTEIN HYATT FARBER SCHRECK LLP is and was at all relevant times a Limited Liability Partnership conducting business in the State of Nevada, more specifically in Las Vegas, Nevada.  BHFS is responsible for the acts and conduct of its partners, attorneys, employees and/or agents.

13.     At relevant times from late 2019 into February 2020, Samuel A. Schwartz, Esquire, licensed to practice law, was a partner with BHFS.

14.     At relevant times, Jonathan Pray, Esquire, licensed to practice law, was General Counsel to BHFS; Richard Benenson, Esquire was Managing Partner of BHFS; Adam K. Bult, Esquire was a Partner with BHFS.

15.      Fresh Mix is informed, believes and thereupon alleges that Defendant, SCHWARTZ LAW, PLLC is and was at all relevant times a Nevada Professional Limited Liability Company, conducting business in the State of Nevada, more specifically in Las Vegas, Nevada.  Schwartz Law is responsible for the acts and conduct of its partners, attorneys, employees and/or agents.

16.     Fresh Mix is informed, believes and thereupon alleges that Defendant, SAMUEL A. SCHWARTZ, ESQUIRE is and was at all relevant times an individual, attorney licensed to practice law, conducting business in the State of Nevada, more specifically in Las Vegas, Nevada. At all relevant times, Schwartz has been the principal member of the law firm of Schwartz Law, PLLC.

17.     Fresh Mix is informed, believes and thereupon alleges that ZACHARIAH LARSON, ESQUIRE is and was at all relevant times an individual, attorney licensed to practice law, conducting business in the State of Nevada, more specifically in Las Vegas, Nevada.  At all relevant times, Larson has been a principal member of the law firm of Larson & Zirzow, LLC.

18.     Fresh Mix is informed, believes and thereupon alleges that LARSON & ZIRZOW

LLC is and was at all relevant times a Limited Liability Company conducting business in the State of Nevada with a principal place of business in the State of Nevada.  LZ is named as defendants for the purposes of Counts X and XI.

19.     The true names and capacities whether individual, corporate, associate or otherwise, of Defendants DOES I through X, inclusive, and ROE CORPORATIONS XI through XX, inclusive, and each of them, are unknown to Fresh Mix at the present time, and Fresh Mix therefore sues said Defendants by such fictitious names. Fresh Mix is informed and believes and thereon alleges that each of the defendants designated herein as DOES I through X and ROE CORPORATIONS XI through XX, are responsible for the claims and damages alleged herein alongside and in conjunction with the Defendants. Once discovery has disclosed the true identities of such parties, Fresh Mix will ask leave to amend this Complaint to insert the true names and capacities of said Defendants DOES I though X, inclusive, and ROE CORPORATIONS XI through XX, inclusive, and to join such defendants in this action.

JURISDICTION

20.     This is an action for damages against Defendants for filing of a bad faith bankruptcy pursuant to 11 U.S.C. §303(i), 28 U.S.C. §1927, F.R.B.P. 9011 of the United States Bankruptcy Code.

21.     This is an action for damages against Defendants for damages pursuant to RICO statutes at 18 U.S.C. §§1961-1964, et. seq.

22.     This is an action for damages pursuant to legal malpractice including, but not limited to, negligence, breach of fiduciary duties, fraud, gross negligence, intentional misconduct, oppression, and malice to justify the award of punitive damages.

23.     The Court has jurisdiction pursuant to 28 U.S.C. §1331 as the claims involve questions of federal law.

24.     The Court has jurisdiction pursuant to 28 U.S.C. §1334 as the claims involve questions arising under federal bankruptcy law.

25.     The Court has jurisdiction over the RICO claim(s) pursuant to 18 U.S.C. §1964.

26.     This Court has jurisdiction over the related state law claims as they arise under the same facts and circumstances forming the bases of the federal claims pursuant to 28 U.S.C. §1367.

27.     Venue is appropriate in the District of Nevada pursuant to 28 U.S.C. §1391(b) in that, a substantial part of the events giving rise to the claims herein occurred in this district and Defendants are subject to personal jurisdiction in this district as of the commencement of this action.  Venue in this district is proper as to Plaintiff's claims under the Racketeer Influenced and Corrupt Organizations Act pursuant to 18 U.S.C. §1965(a).

28.     No allegation in this Complaint is for any good faith communication in furtherance of the right to petition or the right to free speech.  Rather, all claims are based on the legal and professional duties owed by law firms and licensed attorneys to their client and violation of federal statutes.

# FACTUAL BACKGROUND
## A BRIEF FACTUAL HISTORY – THE ROOTS TO THE CREATION OF FRESH MIX

29.     Lagudi Enterprises, LLC ("L-E") was founded in 2001 as a limited liability company in the State of Nevada with its principal place of business in Las Vegas, Nevada with the goal of providing value added food products to businesses.

30.     By 2008, L-E had established itself as a growing produce business providing valued added food products to businesses, including, but not limited to, hotels, casinos and retail entities.

31.     Get Fresh Sales, Inc. ("GFSI") was founded in 1991 by Dominic Caldara and John Wise.  GFSI had established itself as a dominant business in the sale of whole produce to

businesses, including, but not limited to hotels, casinos and retail entities

32.     By late 2008 into early 2009, GFSI recognized that a potential acquisition of L-E and its growing customer base presented a significant diversification and expansion opportunity to GFSI and its affiliated business lines (commonly referred to as the "Get Fresh Companies").

33.     GFSI and its principals, Dominic Caldara ("Caldara"), Scott Goldberg ("Goldberg") and John Wise ("Wise"), understood that L-E had established strong customer relationships created by L-E's principals (Paul Lagudi ("Lagudi") and William Todd Ponder ("Ponder")) with the major businesses while L-E had also established a great reputation for its products and services.

34.     GFSI recognized that L-E's business model, focused on value-added produce, had significantly higher profit margins than GFSI's volume sales of whole produce business lines.

35.     GFSI recognized that the acquisition of/merger with L-E would add significant profitable business lines to the Get Fresh Companies dramatically enhancing the value of the L-E business lines, as well as the value of the Get Fresh Companies.  The acquisition would also give the Get Fresh Companies access to L-E's highly valuable and growing customer relationships.

36.     In 2008, Caldara encountered Ponder at a social event, and began "planting the seeds" for a deal with L-E.

37.     GFSI was focused on a continuing joint venture with L-E (and its principals) in order to recapture the clients taken by L-E and expansion of the value added business lines that L-E brought with it.

38.     GFSI presented L-E with a structure whereby GFSI would handle all operational, financial and administrative needs while the principals of L-E would primarily be engaged in growth of the customer base and sales for the enterprise through the creation of a joint venture that would be part of the Get Fresh Companies.  GFSI and L-E were able to reach an agreement

regarding the merger/acquisition resulting in the creation of Fresh Mix, LLC.

## THE CREATION OF FRESH MIX

39.     Ultimately, GFSI (and its principals, Caldara, Goldberg and Wise) struck a deal with L-E, Lagudi and Ponder whereby the joint venture business of Fresh Mix, LLC was born on January 11, 2010.

40.     Lagudi and Ponder contributed their interest in Lagudi Enterprises, in exchange for $6,125,000 paid by GFSI together with 40% ownership (membership interest) in the newly created entity/venture, Fresh Mix, LLC.

41.     The parties also agreed that Lagudi and Ponder would be employed by Fresh Mix as President and COO, respectively.

42.     GFSI received 60% ownership (membership interest) for which Get Fresh contributed money (utilized to pay L-E) and agreed to provide significant accounting, administrative, back-office, general overhead and support services at no cost.  GFSI and its affiliates also provided the products at their cost to Fresh Mix; or, with Fresh Mix sales, all revenues above actual costs were to be credited to Fresh Mix.

43.     The parties knew that the acquisition was at a lower than market price since the value of the newly formed enterprise would be significantly higher due to the synergies between the companies, to the benefit of all of the owners.

44.     Fresh Mix continued to grow revenue by servicing L-E's existing customers and attracting new ones. The value-added business brought to the Get Fresh Companies by Fresh Mix provided significant growth to the bottom line of the enterprise immediately.

45.     The obligations and commitments of the parties were set forth in the Fresh Mix Operating Agreement, which is attached hereto as **Exhibit "A."**

46.     As set forth in the Operating Agreement, the primary purpose of Fresh Mix was to

"engage in the business of distributing food products of every kind and nature, including without limitation, the operation and expansion of the business of Lagudi Enterprises as conducted as of the date of this Agreement, subject in all events to the terms and conditions of this Agreement." *See* Section 2.4 of Operating Agreement.

47.     Since GFSI held a 60% majority interest the Fresh Mix Operating Agreement contained significant safeguards that dramatically restrained their authority, effectively protecting the interests of the minority parties, Lagudi and Ponder (now Lagudi and Ponder own 100% of Fresh Mix).  Section 5.3 of the Operating Agreement required a super majority vote of the members in order to undertake or approve enumerated decisions.

48.     Section 5.3(f) together with 5.4(b) created the restraint whereby GFSI had to provide products to Fresh Mix at cost.

49.     Sections 5.3(c) and (h) required a super-majority to take any actions that would cause disruption to the business or, more importantly, to take any action to place the company into a bankruptcy.

50.     The Fresh Mix Operating Agreement provisions 2.4 and 5.4(d) provided additional protections to the development and expansion of the "L-E" customers and business lines.  Section 5.4(d) provided:

> …Non-Interference.   Notwithstanding anything in this Agreement to the contrary, it is the intent of the parties hereto that the Company shall succeed to all of the customer relationships of the business of LE as conducted as of the date hereof, and that none of the Company, the Members, the Managers nor any of their respective Affiliates shall divert from the Company, directly or indirectly, any of such customer relationships to any other Person.

///

///

51.     Again, GFSI understood the significant value it had obtained with the merger of the entities and it therefore agreed to convey significant benefits upon Fresh Mix, including, but not limited to:

i.   5.4(b). Supply.   Food products bought and sold between GFS and Company shall be priced at costs, plus actual, out-of-pocket shipping costs incurred.

ii.  5.4I.   Operational Support.   GFS shall provide Company with such operational and administrative support as reasonably necessary in order for Company to conduct the business comprising the Purchased Assets contributed by GFS and L-E to Company as of the date of this Agreement.

52.     Although the "Get Fresh Companies" was comprised of numerous entities (at various times), including, but not limited to Get Fresh Sales, Inc., Fresh Cuts, LLC, Finale Foods, LLC, Get Fresh Kitchen, LLC and Fresh Mix, only GFSI or the Get Fresh Companies were utilized publicly to represent the brands belonging to the Get Fresh Companies (except for the business with Trader Joe's which was with Fresh Mix).  The terms Get Fresh Companies and GFSI were utilized for all external sales and communications (other than Trader Joe's).

53.     Fresh Mix, was now an integral part of the Get Fresh Companies and became the value-added growth engine for the Get Fresh Companies.  Lagudi and Ponder providing the marketing, product design & innovation, and creative energy for Fresh Mix to grow the Get Fresh Companies, including the retail and other value-added sales components.  The other divisions of the Get Fresh Companies provided the manufacturing, distribution and administrative support promised to Fresh Mix.

54.     The definition of the voting safeguards was in the Operating Agreement; super majority of the members meant 75% (Section 1.66) while super majority of the managers meant 80% (Section 1.67).  Again, many of the major decisions were identified in Section 5.3(a) through

(j).  Major decisions could not be undertaken by the Managers, nor by GFSI on its own; they required the vote of Lagudi and Ponder, specifically, Lagudi due to the math.

55.     Caldara, Goldberg and Wise ("GFS Managers") became three (3) of the managers of Fresh Mix with Lagudi and Ponder ("L-E Managers") serving as the other two (2) managers. There were five (5) managers of Fresh Mix.

**THE GET FRESH COMPANIES FLOURISH AND GROW DUE TO FRESH MIX**

56.     Through the efforts of the L-E Managers, Fresh Mix developed clientele across a number of platforms, including supermarkets, warehouse clubs, casinos, and other customers across the Southwestern United States with possibilities of growing beyond.

57.     It did not take long for Fresh Mix to have an impact on the Get Fresh Companies. With the arrival of Fresh Mix in 2010, the new lines of business resulted in profits for the Get Fresh Companies to almost double; the value of the addition of Fresh Mix was instantly visible on the bottom line of the enterprise.

58.     The acquisition/merger of Lagudi Enterprises into the Get Fresh Companies (effectively as Fresh Mix) brought a whole new dimension of retail sales to the enterprise and in 2011 as part of that expansion, Fresh Mix acquired UPCs from GS1 in order to support its growing retail/consumer product sales segment.  The UPCs were specifically acquired to be able to properly label and identify Fresh Mix's retail products sold to its expanding network of business clients selling to consumers.

59.     These Fresh Mix retail products were primarily produced by Fresh Cuts, one of the divisions of the Get Fresh Companies.

60.     With the blessing of Caldara, Goldberg and Wise, Fresh Mix, through its Manager/Member Ponder, assisted Get Fresh and the other affiliates to be better suited to support the growing business of Fresh Mix (and the enterprise).  Ponder provided substantial support to

help develop capabilities of the defendants to support the business interests of Fresh Mix.  Ponder was placed on the Senior Leadership Team ("SLT") of the Get Fresh Companies and was placed in charge of Fresh Cuts, the value-added production affiliate.  Although Ponder was not part of GFSI, he was placed in a place of leadership to allow GFSI and its Affiliates to help keep up with and support the growing lines of business and sales brought in by Fresh Mix.

61.     Fresh Mix had two employees, Lagudi as President and Ponder as COO.  Lagudi and Ponder were the only full time employees to Fresh Mix, ever.

62.     Although GFSI was obligated to provide significant administrative support, including sales support, Lagudi and Ponder were effectively the driving engine behind Fresh Mix's sales and growth.

63.     By 2017, Fresh Mix had dramatically expanded the retail and value-added components and sales for the Get Fresh Companies to include major grocery chains in the region, with potential opportunities on a larger scale.

64.     Fresh Mix continued expand opportunities that required the promised support of GFSI (and the affiliates being created).  GFSI continued to provide the required support and ultimately would add Get Fresh Kitchen to expand the enterprise's capabilities in producing value-added products.

65.     The added and expanded retail and value-added components brought by Fresh Mix to the enterprise resulted in significantly higher profit margin business opportunities for the Get Fresh Companies.  These new and expanded business lines made the enterprise and Fresh Mix significantly more valuable.

***Maintaining the Financial Records***

66.     From its creation in 2010, Fresh Mix has not had its own independent financial records; rather the details of its accounting are fully integrated with and a part of the Get Fresh

Companies'/GFSI's accounting system, more specifically the Thyme System.  The Operating Agreement provides that Fresh Mix is to be charged the true costs of the products that GFSI (and its affiliates) provide to Fresh Mix.  Schedule A of the Operating Agreement provides more insight into the structure whereby Fresh Mix was to be charged specific costs on a per pound allocation methodology.

67.     Other than sales for Trader Joe's, the sales records for Fresh Mix are fully contained within the GFSI Thyme system while the costs of goods sold were contained within the Fresh Cuts, Get Fresh Kitchen and GFSI Thyme systems.

68.     Although Fresh Mix and all of its managers were supposed to have access to and maintain the books and records of the Company under Article 9, section 9.1, 9.2, 9.3, et. seq., GFSI retained all of the records which made it difficult for Fresh Mix to truly address and correct any issues with allocations of sales belonging to Fresh Mix.

69.     Without more complete access to the Thyme system records or guidance from its professional representatives, Fresh Mix was unable to fully evaluate the impact of under-reporting of its revenues due to these misallocations (under-reporting) of sales belonging to Fresh Mix.

**POTENTIAL SALE OF THE ENTERPRISE GETS UNDERWAY**

70.     In the spring and summer of 2017 with Fresh Mix's popularity increasing (and the Get Fresh Companies' value continuing to grow), Caldara, Goldberg and Wise began exploring a potential sale of the Get Fresh Companies.

71.     They engaged Augeo (and legal services) regarding the potential sale of the Get Fresh Family of Companies, which included all of the enterprise components, GFSI, Fresh Mix and Fresh Cuts (and would include Get Fresh Kitchen if a sale took place later in 2018-2019).

72.     The principals of the various enterprise components knew that the Get Fresh Companies had become quite valuable.  In fact, Caldara and Goldberg were spearheading the

effort to market and sell the enterprise.  Confirming that view, the GFS Managers and Owners obtained various valuations and letters of interest regarding the value of the family of companies.

73.     According to the IOIs that had been obtained, the Get Fresh Companies was now worth from $140,000,000.00 to in excess of $170,000,000.00.

///

74.     Lagudi (Fresh Mix's President) sought to better understand the value of Fresh Mix in connection with the enterprise sale.

75.     In response to Lagudi's inquiries regarding the value of Fresh Mix, Goldberg created a valuation chart in 2018 showing the approximate proportionate value of Fresh Mix relative to the overall enterprise valuation.  On January 15, 2018, Caldara provided the valuation chart to Lagudi demonstrating that Fresh Mix was worth at least 28.109% of the entire enterprise value based on Goldberg's initial calculations ($35-$50 million dollars).

76.     The valuation of Fresh Mix was understated for multiple reasons, including, but not limited to overstated costs and understated sales and revenues.  The real value of Fresh Mix was closer to being in excess of $85 million dollars not including funds previously diverted.

77.     Issues like the one addressed on March 7, 2018 demonstrated that Fresh Mix had been undervalued due to overstated costs.  On March 7, 2018, GFSI admitted that it had over-reported Fresh Mix actual costs by $1,048,766.00 (under-reported cost refunds/rebates) due to cost refunds/rebates that GFSI had received and not credited to Fresh Mix.  That mistake alone represented a significant under-reporting of Fresh Mix value.  Likewise, sales belonging to Fresh Mix had been significantly under-reported and misallocated to other Get Fresh Companies.  (The Defendants knew of this issue but did nothing to protect Fresh Mix.)

78.     When adding back misallocated sales the real value of Fresh Mix as a percentage of the enterprise was closer to 50% of the enterprise value when Fresh Mix was credited with sales

belonging to it.  As well, millions of dollars in revenues had been misallocated and diverted away from Fresh Mix.

79.     Fresh Mix's value together with improperly diverted sales exceeded $100,000,000.00.

80.     Lagudi, raised concerns that sales belonging to Fresh Mix had been misallocated/diverted.  Before any sale of the enterprise could be completed, the sales and profits that belonged to Fresh Mix, needed to be corrected so a proper allocation of the sale of the enterprise could be accomplished; the substantially higher value of Fresh Mix as a percentage of the overall enterprise needed to be recognized.

81.     Caldara and Goldberg assured Lagudi that Fresh Mix's financial records would be straightened away and Fresh Mix given its true allocations before any sale occurred.

82.     Because of Fresh Mix's Operating Agreement, a super-majority of the members of Fresh Mix needed to consent to the sale as structured (an asset sale).

83.     Since Fresh Mix had a different ownership structure than the rest of the enterprise, it was important for Fresh Mix to be properly valued.  The efforts to get the enterprise sold became more antagonistic due to the different ownership structures and it was now time for the various constituencies to have their own representation.

84.     It was now early 2018 and the principals were still looking to get a sale completed. At this point the principals believed involving legal representation would be beneficial.

85.     The principals met in their boardroom to address the sales allocations of various customers. Caldara wrote his desired allocations of customer sales on a white board as part of the effort to resolve any differences.

86.     The GFS Managers were eager to enter into a sale agreement for the enterprise, but they were less eager to fully and properly value Fresh Mix.

87.     The Fresh Mix officers Lagudi and Ponder had continued to raise concerns that the GFSI, which was contractually and legally responsible to provide administrative, accounting and operational support for Fresh Mix, was not providing that support and thereby creating legal and financial disputes that needed to be addressed.

88.     By late 2017 into early 2018 it was clear that Fresh Mix, through its President and COO, had identified that the legal and financial disputes needed to be addressed.  The January 15, 2018 valuation analysis has further exposed the concerns raised by the Fresh Mix officers (the only full time employees running Fresh Mix).

89.     The President and COO of Fresh Mix raised concerns about a growing dispute between GFSI and Fresh Mix as to valuation allocation between GFSI and Fresh Mix.

90.     GFSI had hired deal counsel (Akin Gump) to represent the interests of the entire enterprise, but the individual principals and entities that comprised the Get Fresh Companies did not previously have their own, independent counsel.

91.     It was time for each party in the enterprise to get their own counsel.

**"Separate" Counsel Get Involved**

92.     The GFSI principals thought it was best to hire counsel to bridge any of their differences in how Fresh Mix fit into the global sale of the enterprise.

93.     On March 23, 2018, GFSI engaged Cohen Dowd Quigley, PC ("CDQ") to assist GFSI in working through its differences with the other Fresh Mix members.  The CDQ fee agreement is attached as **Exhibit "B"**.

94.     CDQ's representation changed over the course of time and CDQ admittedly jointly represented Fresh Mix along with GFSI. See **Exhibit "C"**.

95.     On April 12, 2018, Goldberg hired Bruce A. Leslie, Esquire of Bruce A. Leslie, Chtd. (collectively "BAL" and/or "BAL Defendants") to help him personally.  The BAL

Defendants soon began assisting GFSI, Caldara, Goldberg and Wise, as well. The BAL Defendants' fee agreement is attached as **Exhibit "D"**.

96.     The BAL Defendants' representation changed in late 2018 when the BAL Defendants assisted Fresh Mix with employment issues as well as formally entering their appearance in court, jointly representing Fresh Mix along with its other clients.

97.     BAL admittedly jointly represented Fresh Mix and GFSI.

98.     On or about November 19, 2018, Pisanelli Bice PLLC began jointly representing Fresh Mix and GFSI, collectively referred to as "Get Fresh". The PB engagement agreement is attached as **Exhibit "E"**.

99.     On or before December 6, 2019, Brownstein Hyatt Farber Schreck LLP ("BHFS") became part of the team of attorneys jointly representing Fresh Mix and GFSI, et. al. Samuel A. Schwartz, Esquire was the BHFS partner who provided the engagement agreement to Fresh Mix and GFSI (jointly referred to as "Get Fresh") though joint counsel, Pisanelli Bice PLLC. The BHFS engagement agreement coordinated directly through Fresh Mix's counsel, Pisanelli Bice PLLC, is attached as **Exhibit "F"**.

100.     Samuel A. Schwartz, Esquire left BHFS in early 2020, but continued his involvement with representing Fresh Mix and GFSI in his new firm, Schwartz Law, PLLC. The Schwartz engagement is attached as **Exhibit "G"**.

101.     The above attorneys were engaged to jointly represent the interests of Fresh Mix and GFSI (et. al.) because it was, "understood that the interests of Get Fresh and Fresh Mix were aligned…"

102.     At no time prior to the filing of the abusive involuntary bankruptcy on April 23, 2020 did any of the joint attorneys disclose the true nature of their adverse representation; rather the attorneys deceived their clients and breached their legal and professional duties to the extreme

detriment of their clients, specifically Fresh Mix as set forth more fully in this Complaint.  See Bankruptcy Court Order to Show Cause issued on November 16, 2023, attached as **Exhibit "H"** and the January 22, 2024, Bankruptcy Court Dismissal Order attached as **Exhibit "I"**.  It should be noted that the Defendants conceded that their ill-conceived plan and orchestration that culminated in the involuntary petition was an abuse of process, effectively confirming that their conduct was bad faith.

103.    At all relevant times prior to the abusive involuntary bankruptcy the Defendants were supposedly acting on behalf and for the benefit of Fresh Mix, one of the joint clients.

104.    CDQ was unsuccessful in obtaining a quick resolution to the growing issues.

105.    On May 2nd or 3rd, when BAL only personally represented Goldberg and no others, Goldberg, at BAL's request, provided BAL with a memorandum containing "*legal strategies and a decision tree regarding potential resolution and plans...*" on addressing Fresh Mix.

106.    Goldberg also provided his memo to Caldara and Wise before they ever met with BAL.  Shortly thereafter, Caldara, Goldberg and Wise met with BAL to see if he would be interested in helping in the GFSI/Fresh Mix situation; BAL agreed.

107.    The memo discussing strategies was also provided to Fresh Mix's other joint counsel, CDQ and later to PB (and possibly others).

108.    Shortly after BAL became involved, the legal strategy by the GFSI and GFS Managers in addressing Fresh Mix's officers' (and other members') concerns shifted.  It now appeared that GFSI and the GFS Managers were going to take a different approach based on the advice of counsel.

109.    On May 23, 2018, GFSI removed Ponder from its SLT.  Caldara told the employees of the Get Fresh Companies that Ponder, who was running the value-added division, was going to focus more of his time and energies on Fresh Mix.

110.    The Fresh Mix officers were isolated from accessing any direct information regarding Fresh Mix while efforts to negotiate a resolution of differences continued in the spring and summer of 2018.

111.    By the fall of 2018, CDQ and BAL had failed in working out a settlement of the differences amongst the various parties, including GFSI and Fresh Mix and the individual principals of the companies.  CDQ recommended that the parties try to mediate their differences.

112.    Unfortunately, the initial mediation was unsuccessful and by mid-November, CDQ's founding partner, Ron Cohen, Esquire, recommended to GFSI and Fresh Mix that they jointly obtain the services of a "bet the company" law firm, Pisanelli Bice, PLLC.

113.    The PB fee agreement identified the PB clients as Get Fresh Sales, Inc. and Fresh Mix, LLC which were collectively defined as "Get Fresh."

114.    PB was clearly jointly representing Fresh Mix and GFSI.

115.    According to CDQ's and BAL's ("Defendants") billing records, they were already examining reasons to invoke the Fresh Mix Operating Agreement arbitration clause (Section 14.7); with the addition of the "bet the company" law firm PB, the tactics of the Fresh Mix/GFSI joint legal team became more aggressive, looking for additional ways to push out Lagudi and Ponder, even to the detriment and harm of their client, Fresh Mix.

116.    The Fresh Mix (and GFSI joint) legal team now included the CDQ Defendants, BAL Defendants and PB Defendants.

117.    Even though Lagudi and Ponder were the primary engine for Fresh Mix sales and growth, on November 26, 2018, on the advice of counsel, the GFS Managers and GFSI as majorities on behalf of Fresh Mix fired Lagudi and Ponder from their officer positions with Fresh Mix.

118.    Lagudi and Ponder were still members and managers of Fresh Mix.

119.    On November 26, 2018, on the advice of counsel, the Get Fresh Companies, including Fresh Mix, notwithstanding Lagudi and Ponder were members and managers, locked out Lagudi and Ponder from any access to any and all information regarding Fresh Mix, including their business email accounts that they were given years earlier.

120.    On November 26, 2018, on the advice of counsel, the Get Fresh Companies, including Fresh Mix, falsely told employees of the Get Fresh Companies that Lagudi and Ponder were no longer associated with the enterprise and had left to pursue other ventures.  Lagudi and Ponder were still managers and members of Fresh Mix.

121.    On December 3, 2018, Lagudi and Ponder filed suit in the District Court of Nevada, Clark County against GFSI and Fresh Mix, seeking emergency relief to regain access to Fresh Mix.

122.    On December 11, 2018, Pisanelli (JJP), Spinelli (DLS) and Leslie (BAL) entered their appearances and argued on behalf of Fresh Mix (and GFSI).

123.    At the initial hearing in the State Court, the Judge reminded counsel and the parties that they had a "…*fiduciary duty to make sure the company [Fresh Mix] keeps going.*"

124.    Shortly thereafter, Fresh Mix and GFSI filed a motion to enforce the arbitration provisions contained in the Fresh Mix Operating Agreement.  On February 1, 2019, the State Court technically stayed the state court action and directed the parties to address their differences in arbitration pursuant to section 14.7 of the Fresh Mix Operating Agreement.

125.    In the late summer, early fall of 2018, CDQ and BAL started working on a potential arbitration demand for GFSI and Fresh Mix.  The PB Defendants joined the team and assisted with the arbitration demand for GFSI and Fresh Mix.

126.    On February 13, 2019, pursuant to the legal advice and counsel from the Defendants, Fresh Mix and GFSI jointly filed a demand for arbitration against Lagudi and Ponder,

raising facts and arguments that they knew or should have known did not support any claims for relief and/or were intentionally false.

127.    The Defendants knew there was a dispute between GFSI and Fresh Mix over the allocation of customer accounts and overall allocation of the value of Fresh Mix versus GFSI but the CDQ Defendants, PB Defendants and BAL Defendants elected to betray their professional and legal duties to Fresh Mix and ignore the conflicts in their representation in order to further the "bet the company" scheme that was well underway.  (See RPC 1.7 and 1.13)

128.    The arbitration demand(s) sought to raise false claims against Lagudi and Ponder claiming some undefined harm to Fresh Mix (and GFSI).

129.    It appears that Defendants' recommendations and misconduct were designed to benefit one client (GFSI) over the other client (Fresh Mix) in order to exert pressure on Lagudi and Ponder to yield their ownership interests in Fresh Mix, as well as devalue Fresh Mix; Defendants had professional and legal duties to protect Fresh Mix, not engage in conduct to devalue it for the benefit of GFSI.

130.    Even though the Defendants knew many of the claims were false and harmful to Fresh Mix they did not care what harm they inflicted upon their own client, Fresh Mix.  The Defendants were apparently willing to anything to 'win' the litigation.

131.    On April 8, 2019, pursuant to the advice of counsel (Defendants, PB, CDQ and BAL), Goldberg, as the CFO of Fresh Mix, advised the Fresh Mix members, that NO distributions of cash would be made due to reserve requirements under section 7.4 of the Operating Agreement and DE Code 18-607.  Only minimum tax distributions required under 7.2 of the Operating Agreement would be made.  The letter is attached hereto as **Exhibit "J"**.

132.    The Defendants' deceit and real purpose of this letter would soon become apparent when Defendants began planning the demise of their own client, Fresh Mix.

133.     Defendants' actions did not deter Lagudi and Ponder, and in the summer of 2019, they sought to amend the state court action to raise derivative claims against GFSI and the GFS Managers for the benefit of Fresh Mix.

134.     Late in the summer of 2019, all parties amended their arbitration claims and Lagudi and Ponder raised derivative claims on behalf of Fresh Mix.

135.     The Defendants still claimed there were no issues in jointly representing the GFSI and Fresh Mix as well as the GFS Managers and other entities comprising the Get Fresh Companies.  Once again, the Defendants showed little to no regard for their professional and legal duties to Fresh Mix, a disregard that would become even more evident.

136.     Having isolated the active officers and management of Fresh Mix; having brought fabricated false claims of "misconduct"; the Defendants also sought to grossly reduce the value of Fresh Mix in further betrayal of their client, Fresh Mix.

137.     Demonstrating the depravity of their arrogance and tactics, Fresh Mix's own counsel, the Defendants, were willing to argue that Fresh Mix did not have much value.  The true nature of the Defendants' unbelievable behavior was just getting started.

138.     In addition to undermining Fresh Mix relationships, the Defendants' negligent and/or intentional/fraudulent misconduct with malice continued to know no limits as they also knowingly, intentionally and/or with such reckless disregard to constitute intentional conduct/malice, covered up and hid the fact that Fresh Mix profits and value were being significantly under-reported.

139.     In late 2019, CDQ obtained an "expert" report that grossly understated the true value of Fresh Mix.

140.     By late 2019, Fresh Mix was still producing significant profits and the Defendants began searching for another way to undermine their own client, Fresh Mix.

141.    By late 2019, the Defendants were soon going to have to surrender significant financial information belonging to Fresh Mix and demonstrating the real financials of Fresh Mix that they had fought to keep buried and hidden.  The disclosures had to be made pursuant to and as part of the arbitration discovery process.  The Defendants knew that the true value of Fresh Mix would soon be discovered and they searched for a way to hide this knowledge (as well as the true nature of their negligence, gross negligence and/or intentional misconduct in the breach of their professional and legal duties to Fresh Mix).

142.    The GFSI Parties were following the directions of the Defendants as to how to "bet the company" litigation.  The GFSI Parties were relying on what the Defendants told them.

143.    Knowing Defendants were fighting a losing battle in the arbitration and trying to keep their deceit undiscovered, the Defendants arranged for a mediation in New York City in order to try to settle the case.  If the mediation was successful, then their wrongful conduct would remain hidden, but if the mediation did not succeed they knew they needed alternate plans to derail the arbitration process.

144.    CDQ took the lead in obtaining at least a couple of low-ball appraisals regarding Fresh Mix.  CDQ's efforts in obtaining low valuations may have been beneficial to GFSI, but it was certainly not in the best interests of Fresh Mix.

145.    The Defendants (CDQ, PB and BAL) coordinated for the mediation in New York while also looking at other strategies in the event the mediation failed.

146.    The mediation took place on November 26, 2019 and was unsuccessful.

147.    On November 30, 2019, CDQ, PB and BAL were already discussing bankruptcy as a strategy choice.  There was no reason to file a bankruptcy for or against Fresh Mix.  Additionally, there was no legal nor valid reason for Fresh Mix counsel to even consider placing

Fresh Mix into bankruptcy.

***The Memo Scheme***

148.    One plan involved pressing their arguments regarding weaponization of a "privileged" memorandum (the "Memo" that had been given to BAL when BAL only represented Goldberg personally – a memo that is not privileged) that Goldberg had given to each and every Fresh Mix counsel, as well as Caldara and Wise.  *GFSI has now disavowed and waived the 'privilege' claim regarding **all** communications with BAL regarding Fresh Mix from March 23, 2018 through September 18, 2022, which includes the Memo.*

149.    The weaponization was that the Defendants would present a false narrative regarding the creation of the Memo and a false narrative as to their professional and legal duties as amongst the joint clients, Fresh Mix, GFSI, et. al.  The weaponization of the Memo before the State Court was purely a creation of the joint counsel designed to derail the Arbitration.

150.    The memo scheme was designed by Defendants to attack opposing counsel as well as Lagudi and Ponder to send the arbitration and state court matters into disarray.  The Defendants knew that providing discovery would result in the unraveling of their plan to lay waste to their client Fresh Mix for the benefit of their other clients.

151.    The Defendants' strategy partially succeeded as the state court proceeding and arbitration proceeding were effectively halted pending an appellant process.  One attorney for Lagudi and Ponder was disqualified and monetary sanctions would possibly be awarded to Fresh Mix and GFSI.

152.    The court also disbanded the arbitration panel at the request of the Defendants to the detriment of Fresh Mix.  Ultimately, the court and successor counsel to GFSI acknowledged that the court had exceeded its authority regarding the arbitration; and agreed that the Court exceeded its authority in doing anything to the arbitration panel.

153. The State Court ultimately reversed itself as to the arbitration and it was allowed to continue with the original panel.

154. The scheme did not result in the complete undoing of the arbitration (which arbitration was initiated by Fresh Mix and GFSI) but did bring it to a halt pending a reconsideration motion and appeal of the State Court Judge's decision, a decision that was written by James Pisanelli, Esquire and his law firm (counsel for Fresh Mix) in order to continue to hurt Fresh Mix, his own client.[1]

155. Defendants' goal was to try to stop Lagudi and Ponder from learning the true value of Fresh Mix while also keeping Fresh Mix's true value hidden from anyone to the detriment and harm of Fresh Mix.

156. With the arbitration and state court proceedings derailed temporarily and COVID now on the rise, the Defendants thought they had the perfect cover to destroy Fresh Mix (their client) for the benefit of Defendants' other clients.

***Defendants Plot Against Their Client, Fresh Mix***

157. PB, CDQ and BAL were not bankruptcy attorneys. The plan thought upon by BHFS and Schwartz was now going to be implemented.

158. On December 11, 2018, the state court told the parties (and their counsel, including Defendants, "…*as a member or manager they have a fiduciary duty to make sure the company keeps going.*"

///

---

[1] It should be noted that all of the Defendants, through Samuel Schwartz, Esquire on behalf of Get Fresh, were asked for proof that there were any conflict of interest waivers, yet none were produced. Fresh Mix and Get Fresh were never advised of any potential conflict. None of the Defendants, nor BHFS nor Mr. Schwartz have presented anything that would be required to engage in any conduct on behalf of conflicted parties, nor have they obtained any required permission to undertake the actions that they did in violation of Fresh Mix's clear rights.

159.    Seemingly in compliance with their duties to Fresh Mix, Defendants advised Fresh Mix to stop any distributions to members, other than minimal tax distributions.  Upon the advice of the Defendants, the Fresh Mix CFO wrote to the membership on April 8, 2019 that:

> In addition to being fiscally responsible, in view of the pending claims, establishment of Reserves is also mandatory under Delaware law.  [See Del. Code §18-607 (prohibiting the Company from making distributions if, after giving effect to the distributions, the Company's liabilities would exceed the fair value of its assets); Operating Agreement §7.4 (requiring compliance with §18-607).]

See Exhibit J.

160.    In reality the efforts recommended by Defendants would be shown to be for ulterior motives to support their other clients to the detriment of Fresh Mix, rather than for its benefit.

161.    At the fall 2019 mediation the Defendants sought to convince Lagudi and Ponder that Fresh Mix had minimal value.  Even though Defendants represented Fresh Mix, they hid the true financial value of the Company as a strategy to hurt members and managers of Fresh Mix.

162.    The mediation failed because the Defendants who were supposed to protect the interests of Fresh Mix were also representing the divergent interests of a member who had not really been involved with nor responsible for the creativity and sales success that was Fresh Mix; the people responsible for the growth of Fresh Mix were the ones shut out from the Company at the direction of Defendants.

163.    It was now November 2019; the mediation had failed and Defendants were now exploring putting Fresh Mix into a bankruptcy.

164.    As of November 2019 Fresh Mix had over $3 million dollars in working capital and continued to make significant profits even with the diversion of revenue away from Fresh Mix; diversion of revenue that continued with the knowledge of the Defendants.

165.    On November 30, 2019, BAL had multiple communications with the other

Defendants regarding a potential bankruptcy option against his client Fresh Mix.

166.    Defendants all handle commercial/corporate matters, and all understood the importance of the Fresh Mix Operating Agreement; after all, it was their legal advice to stop paying out Fresh Mix profit other than to satisfy tax obligations.

167.    The Defendants knew or should have known in their professional capacities that the Fresh Mix Operating Agreement at section 5.3 provides:

> *Approval Required for Certain Matters.*  Notwithstanding anything to the contrary contained herein, no Manager may, without the affirmative vote or unanimous written consent of a Super Majority In Interest of the Members, cause the Company to engage in any of the following activities (each, a "Major Decision"):
> ...
> **(c)   any act which would make it impossible to carry on the ordinary business of the Company;**
> ...
> **(h)   any decision to place the Company into Bankruptcy or otherwise liquidate or dissolve the Company;**
> …

168.    A Super Majority required 75% of the member votes which could not be obtained without Lagudi.

169.    Notwithstanding, the Defendants negligently, grossly negligently and/or intentionally disregarded professional and legal duties to Fresh Mix (under Fresh Mix's Operating Agreement, State Law, including Professional Ethics and Bankruptcy Law). Defendants decided to orchestrate a bankruptcy for or against Fresh Mix.

170.    On December 3, 2019, BAL met with the Fresh Mix CFO to discuss liquidity of Fresh Mix.  So long as Fresh Mix could pay its bills in a timely manner, BAL and the other Defendants knew they could not legally justify a bankruptcy for their client, Fresh Mix.

171.    On December 5, 2019, PB and BAL met with BHFS partner, Samuel A. Schwartz to discuss representing Fresh Mix in a bankruptcy.

172.    BHFS's partners (previously from Schwartz Flansburg, PLLC) did not care about

rules against conflicts of interest as demonstrated by their disregard for conflict issues in the case of *In re: Lucky Dragon Hotel & Casino, LLC* (18-10792).  Using bankruptcies for improper purposes was not a concern to BHFS's partner(s) (or soon to be former partner); see also *In Re: VRS, LLC* (23-13412).

173.     The engagement agreement was provided by BHFS on December 6, 2019 to James Pisanelli and Debra Spinelli of Pisanelli Bice PLLC setting forth that BHFS would represent "Get Fresh".  Exhibit F.  The agreement utilized the terms as defined by Pisanelli Bice.   Specifically, BHFS would represent the parties, "…in connection with preparing and prosecuting the filing of a bankruptcy petition related to Fresh Mix, and to aid or facilitate the resolution of the arbitration, litigation and disputes between the parties."

174.     The BHFS engagement agreement did not specifically identify a corporate entity as the client, rather it identified "Get Fresh".  In fact, on January 17, 2020 when Goldberg returned the signed engagement to BHFS he expressed uncertainty as to whom was the client, Fresh Mix or GFSI; he wanted PB to tighten up that issue.

175.     BHFS was engaged in a joint representation including Fresh Mix.  In fact, BHFS engaged in numerous discussions with the other Defendants regarding the ongoing litigation in both the arbitration and state court proceedings.

176.     The BHFS partners had significant knowledge regarding use and abuse of the bankruptcy system and BHFS was now going to lead the discussions and planning of how to manipulate the joint representation of Fresh Mix to its detriment.

177.     The Defendants had to work together, including the BHFS, to figure out how to orchestrate the bankruptcy against Fresh Mix in order to put it out of business for the benefit of the Defendants' other clients.

178.     In the arbitration, Lagudi and Ponder had been awarded indemnification attorney

fees in late 2019. Fresh Mix paid a few hundred thousand dollars to Lagudi and Ponder. The only award of attorney fees from the arbitration panel was specifically to Lagudi and Ponder, no other member nor manager was awarded anything else.

179.    Defendants were being paid by an entity related to Caldara, Goldberg and Wise, Fresh Investments, LLC. For almost 2 years, Defendants accepted payments from GFSI. When the Defendants decided to implement the bankruptcy strategy against Fresh Mix and in order to further this scheme, they advised GFSI to reimburse itself for 50% of Defendants' prior paid legal fees from Fresh Mix's coffers. Reality was that the Defendants had no means of determining how to allocate the work for 6 clients.

180.    At the Defendants' direction in December 2019, Fresh Mix was forced to transfer almost $2 million dollars to GFSI representing payment of 50% of the legal services the Defendants had provided to GFSI, Caldara, Goldberg, Wise, Get Fresh Kitchen, LLC and Fresh Mix. So legal bills for representation of 6 parties was paid 50% by Fresh Mix.

181.    According to Goldberg:

*Fresh Mix later on reimbursed Get Fresh for costs from all the legal, but at a 50% reimbursement. So once the litigation started and Fresh Mix and Get Fresh were named, our legal counsels said it would be cost prohibitive to try to go through every line item on every bill and try to allocate every single charge from multiple law firms between the companies. And they recommended to me to just split at 50/50. And that's exactly what I did.*

November 13, 2020 testimony of Scott Goldberg

182.    From the actions taken by Defendants, it was clear that they were not providing such significant representation to Fresh Mix, but they would dare not itemize as it would demonstrate their negligent and/or intentional misconduct toward their client, Fresh Mix.

183.    Even after the attorney fees were taken from Fresh Mix, Fresh Mix still had significant cash reserves heading into 2020 and was making money.

184.    On January 28, 2020, the Defendants held another meeting in order to continue their discussions regarding the bankruptcy option for Fresh Mix.

185.    The groundwork for the improper bankruptcy plan had now been laid and the strategy planning against Fresh Mix amongst its own attorneys (the Defendants) continued as they searched for a plausible excuse to execute.

186.    It should have been abundantly clear to the Defendants that they had serious and unwaivable conflicts of interest under the professional duties and ethics and their failure to recognize the issues and the significant harm such failure caused constitutes legal malpractice, if not intentional misconduct.  In fact, Defendants masked their involvement with BHFS and Schwartz at various times in their billing; likewise, BHFS masked its involvement by hiding the truth once their 2019-2020 involvement became known. Notwithstanding, Defendants continued with their negligent and possibly intentional prohibited representation and misconduct as to its client, Fresh Mix.

187.    Because Samuel A. Schwartz was planning to open his own firm, the plans envisioned at BHFS were put on hold while he transitioned to his new firm in early March 2020.

188.    In March 2020, Defendants picked up where they had left off in late 2019 and early 2020, however a new, false excuse had emerged, COVID.

189.    The Defendants had a new flawed plan; they would blame the demise of Fresh Mix on COVID.  The problems were that Fresh Mix had over $2.3 million dollars in cash (even after they misdirected almost $1,700,000 in fraudulent reimbursements for their services) and Fresh Mix was making money during COVID because of Fresh Mix's clientele, such as Kroger and Walmart; retail grocery store businesses that were booming as a result of COVID.

190.    It is likely that Fresh Mix's revenues helped save the Get Fresh Companies during this time period.

191.   In March 2020, the Defendants now including Samuel A. Schwartz with his newly formed firm, Schwartz Law PLLC, continued with their clandestine meetings to hurt their own client, Fresh Mix.  With the new plan to blame COVID, the Defendants continued advising their other clients on how they would destroy their other client, Fresh Mix.

192.   On April 1, 2020, the Defendants attended a conference to discuss the implementation of their bankruptcy plan against their own client, Fresh Mix.

193.   Ron Cohen brought his list of questions that he had drafted.  Bruce Leslie prepared by reviewing the "new" financials.  PB and Schwartz coordinated and led the meeting.

194.   After the meeting, Schwartz emailed the other Defendants about the "…*case strategy*".

195.   To add insult to the outrageous injury, the Defendants representing 6 parties were charging Fresh Mix 50% (not 1/6th) of their bills for work directly related to Defendants negligent, grossly negligent, oppressive, fraudulent or wantonly intentional, malicious and punitive conduct to damage Fresh Mix.  CDQ charged time for BL and RJC to exchange emails about the alternatives to the ongoing litigation, i.e. the bankruptcy against their own client.

196.   Each of the Defendants were paid from Fresh Mix money as they planned the demise of their own client against the Fresh Mix Operating Agreement and state and federal law.

197.   It was now April 2020 and the last monthly financial statement for Fresh Mix demonstrated that it had in excess of $2.3 million in cash (between its bank account and money that GFSI owed to Fresh Mix. - For years, GFSI had always owed Fresh Mix significant sums at the end of each month.)

198.   The Defendants were now set on the scheme of defrauding their own client, Fresh Mix.  Frankly, any advice rendered by any of these joint attorneys is likely malpractice, fraud, malice and/or gross intentional misconduct as to all of their clients.

199.    The Defendants orchestrated that it would have to look like GFSI was a creditor of Fresh Mix and Fresh Mix would have to appear to be insolvent.  Once again, the problem they faced was that Fresh Mix had over $2.3 million in cash and no real creditors.

200.    The Defendants also had additional problems that section 5.4(a) of the Fresh Mix Operating Agreement prohibited any distributions to the members until any member claims were paid in full:

5.4 <u>Transactions between the Company and the Members or Their Affiliates</u>

*1.    Generally.  To the fullest extent permitted by law, all principal, interest, costs and expenses owing by the Company to the Members and/or Affiliates thereof in repayment of loans and all fees, commissions and/or reimbursable amounts payable by the Company to the Members and/or Affiliates thereof shall be treated in the same manner as liabilities payable to unaffiliated creditors of the Company **and shall be paid and taken into account, as such, before any Distributions of Distributable Cash are made to any Member.***

201.    The Defendants had advised about the reserve notice of April 8, 2019 (see Exhibit J) and knew that they could not make the Company insolvent, but there was no way to get a real creditor to file a bankruptcy and the Defendants knew they needed Lagudi's approval to legitimately file a voluntary bankruptcy.

202.    On the advice of counsel, the books and records of Fresh Mix were altered.

203.    The Defendants representing the interests of Fresh Mix told the Fresh Mix majority managers to drain the assets of Fresh Mix by distributing cash to the members in violation of the Fresh Mix Operating Agreement and Delaware Law (DE Code 18-607).

204.    The Defendants representing the interests of Fresh Mix told the Fresh Mix majority managers to manipulate the Fresh Mix books and change its accounting processes so it would look like GFSI was owed approximately $159,000 after the major illegal distribution had been made.

205.    In fact, at the advice of counsel as to how to make Fresh Mix owe GFSI money, Goldberg modeled two different balance sheet scenarios to accomplish the plan created by

1  Defendants.

2  206.    The Defendants did not care that they were not only betraying their client, Fresh

3  Mix, but they were also breaking the federal law and committing bankruptcy fraud.  11 U.S.C.

4  §303(b)(2) precluded GFSI from even being a petitioning creditor, but the Defendants did not care

5  about the harm they were inflicting on Fresh Mix nor the impropriety of their negligent, grossly

6  negligent, fraudulent, oppressive, malicious, and/or intentional misconduct against Fresh Mix.

7

8  207.    The Defendants used their position as counsel to GFSI, Fresh Mix and the GFS

9  Managers (in violation of RPC 1.13) to negligently or unlawfully manipulate the situation to the

10  extreme detriment of Fresh Mix.

11  208.    On April 21, 2020 Schwartz, on behalf of the team of Defendants and in the lead

12  with the bankruptcy and with information improperly obtained in coordination with the other

13  Defendants, prepared an involuntary petition against Fresh Mix.

14

15  209.    On April 21, 2020, Fresh Mix had over $2.3 million in the bank and no real debt.

16  210.    On April 22, 2020, on the advice of counsel, Goldberg signed the involuntary

17  petition declaring under penalty of perjury that Fresh Mix had no assets and could not pay its debts

18  as they came due; reality was that Fresh Mix had over $2.3 million in the bank and no real debt.

19

20  211.    But who would provide Fresh Mix with the negligent or unlawful legal advice and

21  direction to make $2.3 million in distributions?  Counsel for Fresh Mix (Schwartz and Pisanelli)

22  provided the advice.

23  212.    On the morning of April 23, 2020, on the advice of counsel to facilitate the

24  involuntary petition, Goldberg, on behalf of Fresh Mix, told its members that Fresh Mix was

25  making a distribution because it had plenty of capital – a lie created as part of the plan devised by

26  the Defendants.  It also depended on which set of books were utilized since Defendants advised

27  that alternative financials needed to be created to facilitate their scheme.

28

213.   Hours after the distribution on April 23, 2020, Schwartz filed the involuntary petition and provided proof of the filing to the other Defendants.

214.   Schwartz had represented the joint parties of Fresh Mix and GFSI and was now coordinating with the other Defendants to make sure Fresh Mix's counsel did not take action to protect Fresh Mix.  The Defendants represented both the lead creditor and the debtor, clearly conflicted, and they took no action to stop the negligent, grossly negligent or possibly intentional conduct undertaken to harm their client, Fresh Mix.

215.   The Defendants precluded and blocked any effort to intervene for the benefit of Fresh Mix in order to advance the bad faith and fraudulent misconduct of the Defendants.

216.   The malpractice whether out of negligence, gross negligence or punitive willful misconduct had now resulted in the destructive filing of an involuntary bankruptcy petition in the Bankruptcy Court for the District of Nevada (20-12051).

217.   Even though Defendants were clearly acting against the interests of Fresh Mix they continued to coordinate and manage the legal affairs of Fresh Mix before and during the abusive filing until GFSI had to surrender its ownership in Fresh Mix to Lagudi and Ponder (8.3 et. seq. of Fresh Mix Operating Agreement).

218.   During the pendency of the abusive bankruptcy, Fresh Mix was forced to cease all operations; the plans established and put into action by the Defendants destroyed the Company that the Defendants were engaged to protect.

***The Fight By Defendants and Their Counsel During the
Abusive Bankruptcy to Cover Up Their Actions***

219.   The filing of the abusive involuntary bankruptcy resulted in further delays to the arbitration and state court proceedings.

220.   As a result of the bankruptcy the assets, claims and rights of Fresh Mix came under

the control and possession of Chapter 7 Trustee.

221.     As a result of the bankruptcy the Chapter 7 Trustee was entitled to all of Fresh Mix's privileges, including full rights and access to Fresh Mix's legal records, including the legal records in the possession of the Defendants under 11 U.S.C. §541 et. seq., N.R.S. §7.055, and the applicable rules of professional conduct, sections §1.15 and §1.16.

222.     The Chapter 7 Trustee sought to examine claims against Defendants by obtaining the Fresh Mix legal records however each of the Defendants sought to falsely and inappropriately resist their professional and legal duties to surrender the legal files.  They even hired counsel to legitimize their refusal to comply with their underlying duties.

223.     Even now that the abusive bankruptcy has been dismissed Defendants have still failed to turn over the legal records to Fresh Mix.

224.     PB, through its counsel, has even demanded that records it surrendered to the Trustee be returned to PB rather than to Fresh Mix, the owner of the records.  Even though PB gave these same records to GFSI and GFSI's counsel, PB and its counsel are still seeking to cover their malfeasance.

225.     The bankruptcy court rejected the excuses provided by Defendants as to why they would not comply with their legal and professional duties to surrender legal records under state laws and federal laws and ordered pre-petition legal records turned over to the Trustee (the Trustee sits in the shoes of Fresh Mix as to pre-petition rights to legal records belonging to Fresh Mix).

226.     Even though PB, CDQ and BAL were forced to cease any further involvement with the state court and arbitration proceedings due to legal and professional concerns, such as the conflicts that existed, CDQ specifically mentioned "ethical" concerns.

***Pisanelli Bice PLLC's Position***

227.     PB elected to side with one client against another; upon receipt of the demand from

the Trustee, PB advised Schwartz of the letter and hid behind GFSI, rather than adhering to its

legal and fiduciary duties to Fresh Mix.  PB worked hand-in-hand with Schwartz (and other joint

counsel) in order to resist the Trustee's rights to pre-petition legal record in the possession of

Fresh Mix counsel.

228.    PB worked directly with Schwartz in opposing Fresh Mix's legal rights to its legal

records in order to cover-up the enterprise.  Schwartz then wrote a letter to the Trustee, effectively

representing PB, CDQ and Leslie against the Trustee.

229.    PB briefly represented itself but soon hired their colleagues, James Greene, Esquire

and Michael Infuso, Esquire("Greene Infuso") to assist in the cover-up of the negligence, gross

negligence and/or intentional misconduct previously undertaken by PB.  Greene Infuso was not

only there to represent PB, they were there to participate in the cover-up espousing absurd

defenses and claims that breached the fiduciary duties owed to Fresh Mix.  A partial copy of PB's

letter claiming ownership of client records is attached hereto as **Exhibit "K"**.

230.    Rather than recognizing their ongoing duties to their joint client Fresh Mix, PB and

its newly hired counsel, Greene Infuso, decided to support the positions of GFSI to the detriment

and harm of its other client, Fresh Mix.

231.    PB refused to surrender Fresh Mix's legal files under arguments with no merit

under legal or professional standards that PB owned the physical computers upon which Fresh

Mix's legal records were maintained. Their non-sensical position defied their professional and

legal duties to thei clients, yet they continued to argue their position.

232.    While they refused to cooperate with the Chapter 7 Trustee, they continued to work

and assist in the enterprise against Fresh Mix, regardless of their legal and fiduciary duties.

233.    Even after they lost their troublesome arguments, they continue to defy their

obligations to turn over their legal files in the form they were maintained. Rather than providing

the emails, memos, and other documents in their proper formats, according to Jason Hicks, they

provided thousands of pages of PDFs which appears to be to further obscure their deceit.

234.     Even with the dismissal of the abusive bankruptcy PB, through their counsel,

continue to refuse to comply with their legal and fiduciary obligations to Fresh Mix.

***Cohen Dowd Quigley, PC's Position***

235.     CDQ hired Ryan Andersen, Esquire (and his various firms, including, Andersen

Beede, Andersen Beede and Weisenmiller) to represent it before the Bankruptcy Court.

236.     While Andersen was telling the Judge Spraker, "…*To be clear, CDQ does not take

a position over who is entitled to the documents in question and will provide the documents to the

agreed upon party or as directed by a court order.*" (ECF No. 495) behind the scenes CDQ and its

counsel were acting contrary to their official positions.

237.     CDQ professed neutrality, but knowingly and intentionally assisted Schwartz in the

fall of 2021 in reviewing the Trustee's filings and acted against the interests of Fresh Mix.  On

October 29, 2021, Schwartz admitted to the bankruptcy court that he, "*…asked counsel in Arizona,

Cohen Dowd Quigley if they had actually reviewed and analyzed the amended arbitration demand

to see if it did, in fact, cross the privileged memorandum.*"  Notwithstanding CDQ's conflicted

position, CDQ provided the requested assistance to Schwartz, rather than its claimed neutrality.

238.     Andersen's own claim that he was representing a 'neutral' CDQ is contrary to his

actions; whether or not this deception was at the request of CDQ or by his own decision to support

the improper conduct of the Defendants is unknown.  Rather, Andersen conferenced with

Schwartz and the other counsel for Defendants and sought to stifle any progress intended to

benefit of Fresh Mix.

239.     Notwithstanding the Court's Order directing turnover and GFSI's waiver of any

claim of privilege, Andersen has refused to acknowledge communication from Fresh Mix's

counsel or outright rejected and refused to communicate.  Andersen has not arranged for surrender of the legal records to Fresh Mix.

240.     CDQ and Andersen have not been neutral, rather they appear to wish to keep CDQ's and other Defendants' conduct hidden.

241.     On the day of the trial against CDQ, Andersen was clearly interested in seeing GFSI succeed in blocking disclosure of the joint legal records rather than being neutral.  Andersen commented that, "*Seems like Sam needs to appeal this guy*" when Andersen believed the Judge would require turnover of the records that CDQ had already admitted were part of the joint representation.  Andersen's personal attacks during the records trial demonstrates that he was not supporting Fresh Mix's rights to its records; as to the Trustee, Andersen commented, "Dude is basically already out to pasture…".  When Andersen realized that special counsel did not need any testimony from CDQ to confirm CDQ's fiduciary obligations, Andersen decided it was okay to disparage special counsel.  Of course, these comments were made behind the backs of the Trustee and special counsel.  These types of comments just demonstrate that Andersen was not taking a neutral role.

242.     CDQ, through their counsel, Andersen, appear to continue their efforts to cover-up CDQ's and other Defendants' malfeasance as may be shown through the legal records in their possession.

243.     CDQ and Andersen have sought any means to avoid CDQ's duties and obligations to Fresh Mix.

### Bruce A. Leslie, Chtd.'s Position

244.     Bruce A. Leslie, an expert in corporate formality, denied and even lied about his representation of Fresh Mix, claiming he had represented Fresh Mix is some type of 'nominal' capacity.

245.    Despite having appeared in Court for them, despite his own clear and unequivocal statement he made during the midst of the arbitration on May 19, 2019, that, "*First: I want to be clear, I am outside counsel for Fresh Mix…*" Leslie sought to distant himself from the truth in order to avoid surrendering Fresh Mix's legal records (the joint legal records).

246.    However, when Fresh Mix sought its legal records, even though BAL was represented by counsel, BAL never filed answer to the motion to compel turnover.  When given the opportunity to testify in defense of his fraudulent position, BAL refused to testify.

247.    The Court rejected BAL's and GFSI's arguments and concluded there was a joint representation.

248.    Even after he was ordered to turn over records, with the aid of his counsel and GFSI Counsel, Jason Hicks, Leslie then came up with other reasons for delay of turnover.  Jason Hicks claimed that Bruce Leslie's joint records may have contained trade secrets (from 3-5 years earlier) that needed to be reviewed…the ploy was to delay turnover of records as Leslie and GFSI made no prior mention of trade secrets in connection with their refusal to surrender legal records.

**Brownstein Hyatt Farber Schreck LLP's and Samuel A. Schwartz and Schwartz Law PLLC's Positions**

249.    Schwartz and BHFS denied the existence of their prior relationship with Fresh Mix and the other Defendants.  They sought to falsely minimize the reality of their involvement and even failed to disclose the truth when forced to comply with a subpoena; they even hid the existence of their 2019/2020 fee agreement from the Trustee and the Court.

250.    Even when responding to a subpoena and pursuant to Court Ordered enforcement, Adam Bult, partner at BHFS, intentionally kept the existence of the fee agreement hidden in his response.  BHFS even submitted an inaccurate statement from its General Counsel, Jonathan Pray, denying any prior involvement in the representation of Fresh Mix in 2019-2020.  BHFS's

managing partner also failed to acknowledge their prior involvement.

251.    BHFS elected to align with its prior partner, Schwartz who continued to orchestrate the various law firms and lawyers involved in the enterprise.

252.    Even though BHFS had previously been involved working with the Defendants as another joint counsel, in 2022, likely at the request of Schwartz, BHFS agreed to step back in and assist when the other Defendants were forced to withdraw due to their legal and professional constraints.  BHFS sought to interfere with the Chapter 7 Trustee's efforts notwithstanding their prior involvement.

253.    When BHFS's various motions in the state court were all denied and it became more apparent that BHFS was obscuring the truth of its prior involvement, BHFS withdrew from its active role.

### More About the Bankruptcy and "Debtor" Counsel

254.    Typically, bankruptcy schedules are filed by Debtor counsel, but the Defendants made sure Fresh Mix did not have counsel right away.  Instead, Schwartz accepted access to its adversary's records and prepared the schedules.

255.    Since Schwartz knew he could not officially represent the Debtor, he arranged for Zachariah Larson, Esquire ("Larson Zirzow") to appear to be Fresh Mix's counsel.  Through Schwartz's efforts, Larson was hired by and paid by Fresh Investments.  See **Exhibit "L"** and **Exhibit "M"**, respectively.

256.    Even though Larson was supposed to act as Debtor Counsel, he took his lead from Schwartz, his supposed adversary counsel.

257.    It was Schwartz, not Larson, who took it upon himself during 341(a) hearings to interject objections and take positions that clearly belonged to Fresh Mix and the estate; Schwartz insisted that the Fresh Mix witness could not testify on topics based upon attorney-client privilege,

even though, the newly obtained Fresh Mix counsel remained silent.

258.    Even though Larson was supposedly representing the Debtor, he did not actually perform the promised services under his fee agreement.  Where the Court ultimately determined the filing was not appropriate as an abusive filing, Larson was supposed to provide advice as to the appropriateness of the filing but provided no such legal counseling.  (Larson fee agreement, section A(1).)

259.    It is apparent from Larson's actions and inactions, that he failed to provide appropriate legal services to the debtor since he was only an extension of the enterprise and scheme undertaken by the other Defendants.  He was merely put in place by Schwartz to further the scheme.

260.    Even after the settlement amongst GFSI Parties and Lagudi and Ponder occurred, and Larson knew that control of Fresh Mix had been ceded to Lagudi and Ponder, Larson pretended otherwise because of the legal advice Jason Hicks provided to Goldberg.  As a result of this continued gaming, and although Larson's claimed position as Fresh Mix counsel had been terminated long ago by Lagudi (manager of Fresh Mix) from December 25, 2023 Larson ran up over $20,000 in legal bills and refused to surrender Fresh Mix's legal records without payment.

261.    Larson and Hicks both claimed that Fresh Mix was responsible for Larson's fees even though Larson had told the Bankruptcy Court that a stranger to the litigation, Fresh Investments, was paying his bills.  Fresh Investments had nothing to do with the litigation between the GFSI Parties and FM Parties, rather Fresh Investments was a separate real estate and investment company owned by Caldara, Goldberg and Wise.  Fresh Investments had nothing to do with Fresh Mix and nothing to do with the settlement obtained.

262.    Regardless of the terms of the settlement agreement, Hicks had advised his clients, Goldberg and Caldara, to not speak with anyone until after the bankruptcy court approved the

settlement, even though approval was not a mandatory term.  As a result of GT's legal advice, Goldberg and Caldara instructed Larson to not speak with Fresh Mix ownership.  That confusion was caused by the directions of GT, but they failed to properly clarify the issue they had caused.

***Settlement with GFSI Parties***

263.    The bankruptcy court had granted relief from the bankruptcy stay so the underlying state court and arbitration proceedings could move forward and they did.

264.    The legal process was well underway; critical decisions had been rendered in the state court, decisions that allowed the arbitration to restart and pick up where it had previously left off.  The GFSI Parties' attempts to scuttle the arbitration had failed.

265.    By late 2023, the arbitration was deep into the discovery process; expert reports had been exchanged and the arbitration merits hearings were set to take place in February 2024.

266.    On November 16, 2023, the Bankruptcy Court issued an Order to Show Cause why the bankruptcy should not be dismissed for abuse of process.

267.    By November 28, 2023 the GFSI parties and Lagudi and Ponder had reached a settlement in principal, settled their claims with the disclosed part of the settlement involving a significant payment (representing a fraction of the value of Fresh Mix) being made from GFSI to Lagudi and Ponder together with complete ownership of Fresh Mix being turned over to Lagudi and Ponder.

268.    Fresh Mix retains all rights to pursue its prior counsel for the malpractice claims and bad faith sanctions claims that mature with the conclusion of the arbitration and state court matters and the dismissal of the involuntary petition.

269.    Although the settlement did not require approval of the bankruptcy court, Counsel for the GFSI Parties, Jason Hicks of Greenberg Traurig, insisted that there be an effort to obtain bankruptcy court approval through a BKRP 9019 motion as part of the process.

270. Although the BKRP 9019 approval process was going to require disclosure of many of material terms of the settlement into the public forum to the detriment of GFSI, Greenberg Traurig (Jason Hicks, Esquire) prioritized the minimal potential of a Court approval over disclosure of the material terms to the public and likely threats by Defendants.

271. Alternatively, Greenberg Traurig (Jason Hicks) sought to make sure the prior counsel had the opportunity to learn the terms of the settlement and possibly challenge it for their own benefit; after all, Greenberg Traurig had inserted itself into the settlement agreement. Greenberg Traurig was quick to drop the request for court approval when the request threatened to derail the settlement agreement that its clients wanted.

272. The settling parties knew that if there was disclosure of the terms to the Defendants, it was likely the Defendants would raise issues, resulting in the case will ultimately be dismissed as abuse of process (bad faith) dismissal with the future specter of bad faith punitive damages.

273. GFSI's counsel (Greenberg Traurig), who had inherited the representation from Defendants (specifically GT substituted into the case replacing BHFS), gave the Defendants a clear path to acknowledge and accept the settlement along with dismissal of the bankruptcy. The Defendants refused the opportunity and demanded time to oppose the settlement reached by their prior clients and demanded a briefing schedule.

274. Schwartz, who was terminated as bankruptcy GFSI counsel days earlier, appeared at the three dismissal hearings on January 11, 12 and 19, 2024 to speak on behalf of his firm. On January 12, 2024, he even suggested that his office might have an administrative claim against Fresh Mix. The bankruptcy court was not even sure why Schwartz was there speaking since he now represented no one.

275. The Defendants, having learned the basic terms of the settlement from the approval

motion at ECF 1142 (20-12051), sought to interfere with and extend the approval process before the bankruptcy court.

276.    The Motion for Approval disclosed that the GFSI Parties were paying Lagudi and Ponder $25,000,000.00 (ECF 1142, ¶1) and surrendered ownership of Fresh Mix such that Lagudi and Ponder were 100% owners of Fresh Mix (ECF 1142, ¶7) and Fresh Mix retained its rights against third parties not part of the settlement (ECF 1142, ¶8(c)).

277.    The approval motion that was filed almost as a courtesy pursuant to the demand of GT, having no other real value nor purpose, was abandoned by the settling parties.

278.    The bankruptcy court dismissed the bankruptcy as an abuse of process on January 22, 2024.   Since the petition filed under 11 USC §303 was dismissed "*other than on consent of all the petitioners and the debtor…*" the damages allowed under 11 USC §303(i)(1) and (2), including the imposition of punitive damages is appropriate.

279.    It is believed and therefore alleged that all of the Defendants coordinated and worked together and were in communication with the SL Defendants concerning the planning and implementation of the abusive filing notwithstanding their ongoing duty to Fresh Mix.

280.    Schwartz worked in conjunction with the other counsel as joint counsel and tried to conceal his involvement under some sham cloak.

281.    By initiating an involuntary petition that was dismissed as an abuse of process (bad faith), Schwartz and the other Defendants are liable for actual and punitive damages for the destruction of their prior client, Fresh Mix.

282.    The Defendants' failures, illegal, improper and unprofessional conduct led to the ultimate damage and demise of Fresh Mix, a company that they knew was worth in excess of $85,000,000.00, not including revenues that had been removed from the company and concealed during their representation.

283.    The Defendants' negligent, grossly negligent and/or intentional misconduct was against the interests of Fresh Mix and done in violation of the Operating Agreement, Delaware Law and federal law to further their negligent, illegal and/or improper schemes against their own client, Fresh Mix.

284.    As a direct result of the Defendants' actions, GFSI could not support some of the Fresh Mix business and those opportunities were lost to the detriment of Fresh Mix (and GFSI), i.e. the Trader Joe's business.

285.    As a direct result of the Defendants' actions, customers and clients and significant business established by Fresh Mix were lost by Fresh Mix (and GFSI) to the detriment of Fresh Mix (and GFSI).

286.    Before more fully setting forth the new scheme, it is important to understand some of the obligations, commitments and promises the Defendants, as counsel for Fresh Mix, needed to legally protect.  By becoming part of the Get Fresh Family of Companies, Fresh Mix was entitled to:

      i.  Adherence and compliance with Delaware law.  The Company exists under and in accordance with Delaware Law (A of Operating Agreement);

     ii.  A primary purpose was to operate and expand the business L-E (Lagudi) conducted at the date of the Operating Agreement (Section 2.4);

   iii.  No member could act on behalf of the Company without the prior written consent of all of the other members.  So GFSI was not authorized to engage counsel and drain over millions from the Company in doing so.  (Section 4.1).  The Member, GFSI, it's employees, agents, representatives and affiliates are ALL liable under the express

provisions of this section for any damage arising from its unauthorized activities, including the activities undertaken by Caldara, Goldberg and Wise and their related entities.

iv. Notices of meetings occurring.  (Section 4.3).  Whether or not the GFS Managers liked their partners, they have an obligation to keep them in the loop, but did not.

v. The Members have a fiduciary duty to support the purposes of the Company (ii above); they also have a duty, as do the Managers, to not interfere with the purposes of the Company, especially when it comes to the relationships provided by L-E; they cannot divert business developed by L-E away from Fresh Mix.  (Section 4.4).

vi. The Managers had limited authority.  More specifically, the GFS Managers could not remove the L-E Managers. (Section 5.2).

vii. ***The Managers were required to obtain the approval of a Super Majority of the Members (75%)*** for a number of decisions such as; (a) the sale of all assets of the Company; (c) any act which would make it impossible to carry out the ordinary business of the Company; (f) except as allowed under 5.4(b) (purchases at cost), transactions in which a member or an affiliate of the member has a financial interest (such as Pro*Act) and the other GFSI affiliated entities; ***(h) any decision to place the Company into Bankruptcy or otherwise liquidate the Company.***  (Section 5.3).  It should be noted that Scott Goldberg has already admitted that he and his GFSI co-owners intentionally and admittedly violated the terms of this section, specifically section 5.3(h)

when he admitted that the GFS Managers, on the advice of counsel, concurred with their own decision to place the Company into Bankruptcy.

viii. GFSI had to provide all products at cost; they admittedly did not do so on multiple occasions.  GFSI was also to provide the administrative support as reasonably necessary for the Company to conduct business. (Section 5.4).  It should be noted that GFSI was allowed to charge costs for the products but was not authorized to charge for the administrative support it also promised as part of the 60% ownership it received.  The section also prohibits the scheming and self-dealing that the Defendants undertook in stealing/misappropriating business and failing to adequately support the platforms brought to the table by L-E and the L-E Managers.

ix. The members could not steal the business belonging to Fresh Mix. (5.4(d))

x. The conduct of the Defendants against the interests of Fresh Mix led the GFS Managers, GFSI and its affiliates to act inappropriately and violated their obligations to Fresh Mix; actions that constituted material breaches of their duties to Fresh Mix.  (Section 5.9).

xi. An outright prohibition from bankrupting the Company by making the kind of distributions that the Defendants recommended, which advice against the interests of Fresh Mix, Section 7.4, was clearly actionable malpractice.  The Defendants knowingly allowed the GFS Managers and GFSI to break the law in furtherance of their designed scheme.

They couldn't help themselves given their outrageous arrogance and

belief of being larger than life.  DE Code 18-607.

    xii.  Limitations on how a sale of the Company could be undertaken.  See

           Section 5.3(a).

    xiii.  Improperly restricting the L-E Managers and now Fresh Mix itself from

           accessing the Company records.  (Article 9)

287.    Notwithstanding their professional and legal duties to Fresh Mix, CDQ Defendants, PB Defendants, BAL Defendants, and later included the BHFS and SL Defendants made recommendations and took actions that were clearly contrary to the rights and best interests of Fresh Mix and violated their standard of care and professional and legal duties to Fresh Mix, including, but not limited to:

    a.  Recommending, commencing and/or continuing an arbitration for Fresh Mix and GFSI together.

    b.  Taking funds from Fresh Mix, directly or indirectly, for legal services that were not rendered for Fresh Mix.

    c.  Taking funds from Fresh Mix, directly or indirectly, as part of a plan to harm Fresh Mix.

    d.  Assisting in defrauding Fresh Mix.

    e.  Providing legal advice to assist others to defraud, harm or otherwise damage their client, Fresh Mix.

    f.  Engaging in unprofessional conduct to the detriment of their client, Fresh Mix.

    g.  Advised and participated in the intentional and knowing breach of the Operating Agreement to harm Fresh Mix.

    h.  Recommending the issuance of distributions from Fresh Mix as part of a plan to

1   damage, harm and destroy Fresh Mix.

2       i.  Recommended that members and managers take actions contrary to the

3          Operating Agreement and law in order to harm Fresh Mix.

4       j.  Participating and recommending that Fresh Mix be placed into bankruptcy.

5

6       k.  Participating and recommending that Fresh Mix's assets be drained illegally in

7          order to facilitate the filing of an involuntary bankruptcy.

8       l.  Taking other actions and providing legal advice that constitutes negligence,

9          gross negligence, intentional misconduct in violation of their professional and

10         legal  duties to Fresh Mix.

11      m. Participating in the filing of an abusive bankruptcy filing.

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26

27

28

1

2          288.    The Defendants also inflicted harm up Fresh Mix by knowingly, intentionally or

3    with such gross negligence as to constitute intent did:

4
                   a.   Knowingly assisted or induced an attorney (including the other Defendants) to
5
                        violate the Rules of Professional Conduct, either through the actions of the
6
                        attorneys or directly;
7

8                  b.   Engaged in conduct involving dishonesty, fraud, deceit or misrepresentation;

9                  c.   Engaged in conduct that is prejudicial to the administration of justice;

10                 d.   Did not consult with the client about the actions being taken by counsel,

11                      including, but not limited to, taking legal action for Fresh Mix when the counsel
12
                        knowingly needed a super majority of the members to take actions;
13

14                 e.   Did not consult with the client or otherwise disclose relevant limitations on the

15                      lawyer's conduct when the lawyer knew that the assistance requested was not

16                      permitted by applicable law or Rules of Professional Conduct;

17                 f.   Representation of clients where there was a concurrent unwaived/unwaivable

18                      conflict of interest;
19
                   g.   Representation of clients where there was a concurrent conflict of interest when
20
                        the lawyer knew they could not provide competent and diligent representation
21
22                      to Fresh Mix, the affected client, due to the conflict;

23                 h.   Representation of clients where there was a concurrent conflict of interest

24                      where the clients were adverse in the same litigation and/or other proceeding;

25                 i.   Representation of clients where there was a concurrent conflict of interests and
26
                        neither client provided any informed consent, in writing;
27
                   j.   Representation of the client in the matter and then representing an adverse party
28

in the same action without informed consent, given in writing;

k.  Representation of the organization and its officers and members in violation of RPC 1.7/RPC 1.13 and for which no consent was received by the non-represented members/managers;

l.  Failing to surrender the client's papers and property/legal records;

m.  Representation of a party with adverse interests after having consulted with and obtained confidential information from a perspective client;

n.  Making false statements of fact or law to the tribunal as well as failing to correct the false statements made by the lawyer to the detriment of the client;

o.  Offering evidence that the lawyer knew to be false to the detriment of the client;

p.  Knowingly assisting in fraudulent conduct to the detriment of the client and also failing to take reasonable remedial measures, including, disclosure of same to the applicable tribunals;

q.  Bringing frivolous proceedings and defenses in order to prevent the client from availing itself of its rights, including rights against the Defendants due to their misconduct;

r.  Intentionally seeking to delay litigation against the interests of the client;

s.  Unlawfully obstructing and counseling persons to conceal documents and materials with potential evidentiary value concerning unprofessional and illegal conduct of other attorneys;

t.  Knowing making false statements and representations regarding their representation of the client;

u.  Committed bankruptcy fraud against Fresh Mix;

v.  Failing to disclose a material fact necessary to avoid the commission of

fraudulent activity by a client; and,

w.  Such other acts and misconduct that may be disclosed or discovered during the course of the instant litigation.

289.    It is currently unknown what actions the Defendants have taken to insulate their assets from being drawn back in to pay for the damages they have caused; therefore it is requested that Defendants be enjoined from transferring any assets out of their names and that any transfers be only with Court approval to allow transactions in the normal course of business that will not dissipate any Defendants' assets. Further, Plaintiff requests that the assets of Defendants held with a spouse, in trust, or otherwise held in another's name for the benefit of or under the control of the Defendant be frozen by the Court under the same conditions.

290.    Likewise, the Defendants owed a duty of loyalty to Fresh Mix, yet in violation of their duties and professional obligations they turned on their own client, Fresh Mix to further the conspiracy and wrongful conduct of the Defendants.

291.    The Defendants did knowingly and intentionally utilize confidential information adversely to the interests of Fresh Mix.

292.    The Defendants knew and/or should have known that planning against their own client, Fresh Mix, violated their duty of loyalty to Fresh Mix.

293.    The Defendants knew and/or should have known that their representation of conflicted parties was prohibited by applicable ethics rules.

294.    The Defendants knew and/or should have known that their advice and actions were for the sole benefit of the other Get Fresh Companies and the GFS Managers; to the detriment of their other joint-client, Fresh Mix in violation of their legal obligations.

295.    The Defendants knew and/or should have known that their conduct was a proximate cause to the misconduct and wrongful actions that facilitated the bankruptcy causing

tens of millions of dollars in damage to Fresh Mix.

296.    The Defendants knew and/or should have known that their conduct facilitated the commission of fraudulent conduct against the interest of Fresh Mix in the same proceedings;

297.    The Defendants violated and breached their professional and legal duties to Fresh Mix by negligently, grossly negligently, with such reckless disregard as to constitute intent and malice, or intentionally took actions and made legal recommendations and facilitated and assisted others to undertake actions designed to damage and harm Fresh Mix.

298.    At all relevant times, there was an attorney-client relationship between Plaintiff and each of the Defendants.

299.    At all relevant times, each of the Defendants owed a duty to exercise skill, prudence and diligence in the performance and provision of their representation and in their capacity as counsel performing tasks and legal work for the benefit of Fresh Mix (Plaintiff).

300.    Each of the Defendants breached their duty as set forth in this Complaint.

301.    The breach by each of the Defendants, individually and collectively (severally and jointly) was the proximate cause of the damages inflicted upon Fresh Mix (and GFSI).

302.    The Plaintiff has suffered substantial damages resulting from the negligent and/or intentional negligence of the Defendants.

303.    The conduct of each of the Defendants was committed with oppression, fraud and/or malice to warrant the imposition of punitive damages.

**ELEMENTS RELATING TO FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. §§1961, et. seq.**

304.    The Defendants abused their positions as fiduciaries in order to perpetrate a fraud and gross injustice upon Fresh Mix, ignored corporate formalities, commingled and/or accepted funds for improper purposes including millions of dollars diverted from Fresh Mix.  The purpose

of Defendants' improper, negligence, fraudulent and/or malicious direction was to advance and further the scheme to defraud and harm Fresh Mix.

305.    Defendants actively participated in the fraudulent, intentional and malicious scheme in conspiracy with each other as detailed in this complaint.

306.    Defendants acted with the overarching purpose of illicitly assisting their other joint clients to usurp the business and opportunities belonging to Fresh Mix, as well as for their own personal gains.

307.    The Defendants knew and/or believed they were assisting one client to improperly obtain significant value from Fresh Mix regardless of the law.

308.    The Defendants made their covert plans to undertake a corporate coup of Fresh Mix's business operations.

309.    Defendants deliberately or with such gross negligence as to constitute malice and intent, did not disclose the true nature of their plans to stage a coup of Fresh Mix, work with one client to the detriment and harm of another client; strong arm and block officers and managers of Fresh Mix from access to the company; raise false claims against members and managers of Fresh Mix; plans to use illegal, unprofessional and improper means to deceive Fresh Mix in the filing of an improper and abuse involuntary bankruptcy filing to advance the scheme; divert the communications and information such that the scheme remained hidden and undisclosed; present fraudulent declarations, certifications and documents in violation of 18 U.S.C. §§152, 153 (refused to surrender documents belonging to Fresh Mix), 154 (refused to surrender records and documents); 156 (knowingly preparing false documents); 1519 (concealing documents in a case under title 11); and, 1343 (wire fraud).

310.    Defendants' plan and scheme included:

     a.   Planning a coup in order to avoid the restrictions imposed under the operating

1       agreement, state and federal law;

2     b.  Isolating Fresh Mix's officers and managers who were not participants in the

3       scheme and plan;

4     c.  Deliberately depriving non-participants in the fraud from access to Fresh Mix's

5       rights and records;

6

7     d.  Illicitly manipulating the corporate records to present intentionally misleading

8       and false positions unsupported by law and/or fact;

9     e.  Illicitly manipulate Fresh Mix's financial records to wrongfully divert revenues

10       to undermine the performance of Fresh Mix;

11

12     f.  Utilizing improper and ill-conceived arbitration demands to harm Fresh Mix;

13     g.  To restrict Fresh Mix financial and business records, as well as, legal records;

14     h.  Driving Fresh Mix into an abusive involuntary bankruptcy;

15     i.  Driving Fresh Mix into an abusive involuntary bankruptcy for the purpose of

16       misappropriating Fresh Mix property, including intellectual property;

17     j.  Driving Fresh Mix into an abusive involuntary bankruptcy to usurp and

18       improperly obtain business leads, corporate opportunities and ongoing

19

20       relationships from Fresh Mix for the benefit of other clients;

21     k.  Driving Fresh Mix into an abusive involuntary bankruptcy to cover their

22       ongoing fraud, negligence, gross negligence, and/or malicious conduct to harm

23       Fresh Mix;

24     l.  Deliberating taking actions to keep legal records and misconduct hidden from

25       Fresh Mix.

26

27    311.    Defendants planned to utilize their fiduciary positions and roles to drive Fresh Mix

28 out of business, and in furtherance of the scheme sought to improperly drive Fresh Mix into an

involuntary bankruptcy and sought to dissolve Fresh Mix.

312.    After the abusive involuntary bankruptcy was filed the Defendants continued to perpetrate the scheme to not only continue their enterprise but also to now hide their misconduct through further disregard for the law.

313.    The plot and scheme against Fresh Mix was initiated with the guidance and assistance of joint legal counsel who plotted against their client, Fresh Mix, with the other co-counsel and continued to grow with the addition of multiple counsel and law firms, as well as, additional plots and schemes to obtain their desired result which included full control of Fresh Mix to GFSI and Caldara, Goldberg and Wise; alternatively they would destroy Fresh Mix.

314.    They were under fiduciary, professional and legal duties to Fresh Mix to protect it and represent Fresh Mix and undertake representation in the best interests of Fresh Mix.  By withholding critical material information and by concealing their plot against Fresh Mix, they breached their duties.

315.    Defendants furthered the scheme and deception and continued the enterprise in order to advance the harm to Fresh Mix and to keep their deceit and misconduct hidden.

316.    Having failed to accomplish their scheme through the arbitration, having failed to accomplish their scheme through the state court, the Defendants next planned the bankruptcy in a blatant effort to forum shop.

317.    The bankruptcy was carefully and fraudulently orchestrated by the Defendants.

318.    By manipulating the financial records of Fresh Mix and breaching Delaware law, the Defendants orchestrated a fraudulent involuntary chapter 7 filing.

319.    The orchestration of the bankruptcy by Defendants was done so Fresh Mix would lose its assets, including the favorable terms of the operating agreement and its customer base.

320.    The orchestration of the bankruptcy by Defendants also sought to divert the

arbitration litigation to the bankruptcy for improper gains for the benefit of one set of clients over Fresh Mix.

**THE ENTERPRISE**

321.    At all times relevant hereto, PB, James Pisanelli, Debra Spinelli, Ava Schaefer, CDQ, Ronald Cohen, Betsy Lamm, BAL, Bruce A. Leslie, BHFS, Samuel A. Schwartz, as a partner to BHFS and principal of Schwartz Law, and SL Defendants were "persons" within the meaning of 18 U.S.C. §1961(3).  Additional actors, such as BHFS's Richard Benenson, Jonathan Pray and Adam Bult were also "persons" within the meaning of RICO.

322.    At all relevant times hereto, the Defendants were members of and/or employed by or associated with the "enterprise" engaged in, or the activities which affected, interstate commerce within the meaning of 18 U.S.C. §1961(4).

323.    The Defendants' Enterprise included all persons and/or entities who were associated-in-fact with the fraudulent scheme to usurp the Fresh Mix corporate opportunities and business assets.

324.    The Enterprise had an ascertainable structure and continuity of structure and personnel.  In particular, the Defendants worked alongside the GFSI entities in order to fraudulently and intentionally advance the scheme.

325.    The Enterprise had an existence separate and apart from the particular instances of racketeering activity described herein and its members participated in the operation or management of the enterprise.

**THE PATTERN OF RACKETEERING ACTIVITY**

326.    From about March 2018 continuing to the present, the Defendants were members of and were employed by or associated with the Enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a "pattern of racketeering

activity" within the meaning of 18 U.S.C. §1961(1) and/or conspired to do so.

327.    The Defendants, as insiders and fiduciaries, were able to utilize their corporate forms and businesses to commit racketeering described herein by virtue of their control over the affairs of the Enterprise.  These offenses were committed as part of the racketeering activity in that they had the same or similar purposes, results, participants, victims and/or methods of commission, and include two or more related individual offenses which were separate in time and committed with the express intention and common design and purposes of fraudulently acquiring and/or misappropriating funds and/or assets of Fresh Mix, wrongfully diverting assets belonging to Fresh Mix, including, but not limited to, intellectual property, legal records, and funds belonging to Fresh Mix.  This series of related offenses extended over a substantial period of time and continues to pose a threat and harm to Fresh Mix.

328.    The above-alleged pattern of racketeering offenses included, among others, the separate acts and episodes of racketeering activity set forth in this Complaint.

329.    The Defendants have concealed and continue to conceal their misconduct and enterprise which includes mail fraud pursuant to 18 U.S.C. §1341 in which they sent communications through the mail; wire fraud pursuant to 18 U.S.C. §1343 including numerous email communications and transmission of funds through the banking system in furtherance of the enterprise; bankruptcy fraud pursuant to 18 U.S.C. §§152-156; and concealment pursuant to 18 U.S.C. §1519, as well as such other acts prohibited under RICO that may be disclosed through discovery since Defendants have continued to refuse to turnover Fresh Mix's legal records as required by N.R.S. §7.055 and RPC 1.16 in furtherance of their scheme.

**Representative Actions Comprising the Enterprise**

330.    The following chart sets forth a small number of representative dates of communications, meetings and events that are part of the racketeering enterprise by the

Defendants:

| Date | Activity and Participants |
|------|---------------------------|
| March 23, 2018 | CDQ is hired as part of enterprise |
| April 12, 2018 | BAL is hired as part of enterprise |
| May 2, 2018 | At request of BAL, Goldberg drafts a letter outlining strategies to deal with Fresh Mix (and Lagudi and Ponder) and shares it through email with BAL, Caldara and Wise.  Meeting planned with BAL to discuss strategies contained in memo to advance improper enterprise. |
| May 3, 2018 | BAL meets with Goldberg, Caldara and Wise; it is decided that BAL will now represent GFSI and initial enterprise is formed. |
| May 9, 2018 | BAL uses email to send 4 alternative paths to scheme to the "team" |
| July 3, 2018 | BAL holds meeting with others to discuss Fresh Mix operating agreement and look for ways to change things |
| August 8, 2018 | BAL circulates litigation strategies to team |
| August 24, 2018 | BAL and CDQ exchange communications on how to proceed against Fresh Mix, Lagudi and Ponder |
| September 2-5, 2018 | BAL, CDQ and others meet and exchange emails on termination letters to remove Fresh Mix officers based on employment agreements notwithstanding BAL has already determined that there are no active employment agreements |
| September 30, 2018 | Defendants, CDQ and BAL, exchange strategy emails and memorandum on furtherance of plan |
| November 20, 2018 | Defendants, Daniel Quigley and James Pisanelli, hold strategy session on addressing Fresh Mix, notwithstanding they admittedly represent GFSI and Fresh Mix |
| November 26-27, 2018 | Defendants (BAL, CDQ and PB) exchange multiple communications regarding efforts to terminate Fresh Mix officers and isolate them from any further access to company notwithstanding they are managers of the LLC |
| January 9, 2019 | Defendants (BAL, CDQ and PB) exchange emails regarding strategies in state court efforts to advance enterprise notwithstanding conflicting positions |
| January 21-23, 2019 | Defendants (BAL, CDQ and PB) prepare and exchange memorandum and drafts of documents to accuse Fresh Mix managers of false claims of breach of duties.  D. Quigley engages in email exchanges with other Defendants regard strategy being utilized to advance |

| | | |
|---|---|---|
| | | enterprise |
| | January 25-28, 2019 | Defendants (BAL, CDQ and PB) exchange drafts of arbitration demand being drafted to further scheme and reduce value of Fresh Mix in furtherance of enterprise |
| | February 7, 2019 | Defendants (BAL, CDQ and PB) exchange multiple emails and communications and participate in "all-hands" conference regarding the efforts to deceive and defraud Fresh Mix (and Lagudi and Ponder) |
| | March 8, 2019 | Defendants (BAL, CDQ and PB) exchange multiple communications, R. Cohen prepares the agenda for the "all-hands" meeting/conference to advance scheme and enterprise; discussion concerns limiting document production to continue to concealment of Fresh Mix records |
| | April 5, 2019 | Defendants (BAL, CDQ and PB) prepare for and attend all-hands conference to discuss withholding funding from Fresh Mix members (4/8/2019 letter).  Amass any Fresh Mix funds until the parties to the  enterprise later figure out what they need to do with millions of dollars in order to accomplish enterprise goal of diverting assets aand business away from Fresh Mix. |
| | May 10, 2019 | Defendants (BAL, CDQ and PB) prepare for and participate in all-hands meeting(s) and exchanges of communications regarding Defendants misrepresentation of memo to further harm Fresh Mix and advance their efforts for benefit of some clients at the expense of other to further enterprise. |
| | June 6, 2019 | Defendants (BAL, CDQ and PB) engage in multiple communications regarding ongoing strategy efforts, including effort by Econlit to create undervaluation report to harm Fresh Mix; D. Quigley emails regarding the upcoming all-hands conference scheduled for 6/10/2019. |
| | June 10, 2019 | Defendants (BAL, CDQ and PB) participate in all-hands conference including filtering information that will be provided in order to continue obfuscation of true value of Fresh Mix and concepts and planning on how to obtain Fresh Mix through use of under-reporting to the detriment of Fresh Mix. |
| | July 9, 2019 | Defendants (BAL, CDQ and PB) exchange numerous emails on how to support low valuations and conferences with expert; R. Cohen prepares and circulates strategy memo to all in preparation for all-hands call in order to advance enterprise |
| | July 10, 2019 | Defendants (BAL, CDQ and PB) participate in all-hands conference call to discuss strategies against the interests of their client Fresh Mix and in order to |

| | |
|---|---|
| | advance enterprise of inappropriate conduct including the manufacturing of false claims and statements to be made in an amended filing |
| August 12-14, 2019 | R. Cohen prepares and circulates agenda for August 14, 2019 all-hands conference regarding strategies to advance enterprise against Fresh Mix; included in the strategy was to try to split off Ponder to join the enterprise in order to isolate Lagudi even though the Defendants knew that super-majority restrictions required involvement of Lagudi; goal was to create false narrative against Fresh Mix and Lagudi to further harm Fresh Mix. |
| September 3-5, 2019 | R. Cohen and B. Lamm prepare agenda for upcoming all-hands in-person meeting which includes meeting with valuation experts and other strategy topics to advance the enterprise |
| September 6, 2019 | In person, all-hands, meeting with Defendants (BAL, CDQ and PB) and valuation expert and planning on transition of case to another strategy to deceive Fresh Mix, transfer business and assets belonging to Fresh Mix (and Lagudi and Ponder) and to further harm Fresh Mix in continuing enterprise. |
| October 25, 2019 | Defendants (BAL, CDQ and PB) participate in all-hands meeting regarding mediation strategies and it appears that it is during this conference and later conferences that the bankruptcy plot against Fresh Mix emerges if Defendants cannot achieve enterprise goals otherwise. |
| November 8, 2019 | Defendants (BAL, CDQ and PB) participate in all-hands meeting/conference to discuss and plan disclosure of limited information and strategies on how to keep information away from Lagudi/Ponder who now had derivative claims since it was now apparent that Defendants were part of enterprise to harm Fresh Mix while acting as their counsel |
| November 30, 2019 | Defendants (BAL, CDQ, PB, BHFS and SAS) exchange communications on potential illegal and improper bankruptcy filing against their own client (Fresh Mix) for the benefit of other clients in the same matter.  The communications are focused now on use of federal law to further the enterprise to deceive their client and divert assets belonging to Fresh Mix to others.  GFSI does not qualify as a petitioner under 11 USC 303(b), a legal fact . |
| December 5-6, 2019 | Defendants (BAL, CDQ, PB, BHFS and SAS) participate in multiple meetings to strategize how to harm Fresh Mix while acting as its counsel; BHFS |

| | |
|---|---|
| | issues a fee agreement to Pisanelli Bice to be signed on behalf of both Fresh Mix and GFSI ("Get Fresh"). |
| December 17-19, 2019 | Defendants participate in conferences to improperly drain funds belonging to Fresh Mix under the guide of payment of attorney fees/reimbursement even though they have no order allowing such distribution. |
| January 2-3, 2020 | R. Cohen prepares and distributes agenda for all-hands call involving the need to turnover records relevant to and showing deception against Fresh Mix; January 3, 2020 all-hands call held regarding discovery in arbitration and likely involving the advice by Defendants that over $1 million be removed from Fresh Mix improperly under the guise of being legal reimbursement for legal fees at the rate of 50% of all fees even though Fresh Mix was 1 of 6 represented by the same counsel, Defendants. |
| January 28, 2020 | Defendants meet at PB office (and CDQ calls in) to further plan bankruptcy fraud against Fresh Mix to advance and further scheme and enterprise. |
| February 16-18, 2020 | CDQ drafts agenda for all-hands meeting; communications regarding all hands meeting and Defendants engage in all hands meeting on February 18, 2020 in person, in Las Vegas, to advance enterprise. As part of enterprise, Defendants continue fraudulent misrepresentation to state court that there is no professional conflict of interest in their efforts to plan the demise of Fresh Mix through a fraudulent bankruptcy process while simultaneously representing to the state court that they represent the interests of Fresh Mix. |
| April 1, 2020 | Defendants participate in All-hands meeting to plan the bankruptcy of Fresh Mix in violation of state and federal law, including violation of state rules of professional conduct. |
| April 21-23, 2020 | The planning and distribution of Fresh Mix assets to facilitate the involuntary bankruptcy filing in violation of the Operating Agreement and Applicable laws including 18 U.S.C. 1343. |
| June 3, 2021 | In response to request from counsel for the Estate of Fresh Mix, SAS, SL Defendants write on behalf of CDQ, PB and BAL refusing to turn over legal records in violation of Nevada state law and rules of professional conduct. |
| February 18, 2022 | PB, CDQ and BAL withdraw from any further representation of GFSI and Fresh Mix in any legal proceedings involving both.  CDQ withdraws due to "ethical constraints" since they jointly represented both; |

| | all Defendants continue to refuse to turn over legal records forcing estate to bring legal action against each one. |
|---|---|
| March 14, 2022 | BHFS re-enters cases, but solely for GFSI and seeks to have Estate's special counsel enjoined from representing estate in and effort to cover up their prior involvement in the fraudulent enterprise.  They are unsuccessful, but make multiple additional failed attempts in order to prevent disclosure of their true prior involvement. |
| 2021-2023 | All defendants engage in efforts to conceal legal records belonging to Fresh Mix, either by deception or other fraudulent or improper claims. |
| 2022-present | BAL, CDQ and PB have hired counsel in order to protect and cover their involvement in the RICO enterprise.  It is currently unknown the extent to which their representation may have been involved in furtherance of the enterprise or are solely acting as legal representation. |
| November 28, 2023 | GFSI settles claims against it by surrendering all right, title and interest to Fresh Mix over to Lagudi and Ponder together with payment of $25,000,000.00 to Lagudi and Ponder.  Fresh Mix retains all rights and claims to any improper conduct by Defendants (subject to limited joint tortfeasor credit as allowed under Nevada law). |
| January 11, 2024 | Defendants object to their own clients' partial resolution in furtherance of covering up the facs of their enterprise. |
| January 22, 2024 | All Defendants, through their counsel, acknowledge and accept that the involuntary was filed as an abuse of process. |

INJURY

331.    The racketeering enterprise has caused significant actual damages upon Fresh Mix that are recoverable pursuant to 18 U.S.C. §1964(c), together with attorney fees, costs and treble damages.

332.    The foregoing pattern of racketeering activity directly or indirectly caused concrete financial loss to Fresh Mix which was the aim of the Enterprise.

333.    The financial loss to Fresh Mix is evidenced by the following:

a.  Defendants were being paid by an entity related to Caldara, Goldberg and Wise, Fresh Investments, LLC. For almost 2 years, Defendants accepted payments from Fresh Investments. When the Defendants decided to implement the bankruptcy strategy against Fresh Mix and in order to further this scheme, they advised GFSI to reimburse itself for 50% of Defendants' prior paid legal fees from Fresh Mix's coffers. Reality was that the Defendants had no means of determining how to allocate the work for 6 clients.

   i.  Defendants representing 6 parties were charging Fresh Mix 50% (not 1/6th) of their bills for work directly related to Defendants negligent, grossly negligent, oppressive, fraudulent or wantonly intentional, malicious and punitive conduct to damage Fresh Mix. CDQ charged time for BL and RJC to exchange emails about the alternatives to the ongoing litigations, i.e. the bankruptcy against their own client.

b.  Wire fraud pursuant to 18 U.S.C. §1343 including numerous email communication and transmission of funds through the banking system in furtherance of the enterprise

c.  Loss of value insofar as Fresh Mix was valued, in reality, in excess of $85 million dollars not including funds previously diverted, but the Enterprise forced Fresh Mix into bankruptcy causing significant harm to Fresh Mix.

d.  Fresh Mix's value together with improperly diverted sales exceeded $100,000,000.00.

334.  The Plaintiff reserves the right to alter or amend theories of liability as well as facts as may be discovered or otherwise uncovered during the course of discovery.

## COUNT I
**(Aiding and Abetting Breach Fiduciary Duty)**
**(Legal Malpractice)**
**(Fresh Mix v. Defendants)**

335.    Fresh Mix repeats, re-alleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

336.    Defendants knew of the fiduciary duties owed to Fresh Mix by each of the other Defendants.

337.    Defendants knew or should have known that it is malpractice and unprofessional pursuant to N.R.P.C. 8.4(a) to, "*Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;*"

338.    Defendants encouraged and promoted the breach of professional/legal duties.

339.    Defendants' actions were a substantial factor in bringing about the harm and damage suffered by Fresh Mix.

340.    Fresh Mix believes Defendants have continued to act in a manner that violates their fiduciary duties.

341.    These breaches of fiduciary duties have caused and continue to cause injury and damage to Fresh Mix, and include, but are note limited to, loss of income from customers, loss of business opportunities, loss of goodwill, loss of client relationships, and other such losses.

342.    Therefore, Fresh Mix is entitled to damages from Defendants in amounts to be determined.

343.    Conduct of Defendants is so egregious as to support the award of punitive damages.

344.    Fresh Mix has been forced to retain counsel to address the conduct complained of herein and is therefore entitled to all of their attorneys' fees and costs associated with bringing this

action.

## <u>COUNT II</u>
### (Legal Malpractice)
### (Fresh Mix v. CDQ Defendants)

345.    Fresh Mix repeats, re-alleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

346.    At all relevant times, CDQ Defendants provided legal representation to numerous parties, including, but not limited to Fresh Mix, GFSI, Caldara, Goldberg, Wise and the affiliated businesses.

347.    An attorney-client relationship existed between Fresh Mix and CDQ Defendants.

348.    At all relevant times, CDQ Defendants owed professional duties to Fresh Mix, under the law and applicable professional standards.

349.    At all relevant times, CDQ Defendants also represented Get Fresh in the same matters and proceedings involving the disputes including this matter and the arbitration proceeding in which GFSI, including disputes over allocations of profits and revenues between GFSI and Fresh Mix; notwithstanding the inherent conflicts, CDQ Defendants continued to represent Fresh Mix and GFSI (et. al.).

350.    The CDQ Defendants breached their legal duties to Fresh Mix and aided and abetted in the planning and implementation of the frauds upon Fresh Mix, including but not limited to the distribution of the assets of Fresh Mix in order to facilitate the instant bankruptcy filing in violation of the Operating Agreement and applicable laws.

351.    In direct breach of their duties to Fresh Mix, the CDQ Defendants aided and abetted the Defendants in their actions to harm Fresh Mix.

352.    The CDQ Defendants breached their duty of loyalty to Fresh Mix.

353.    The CDQ Defendants failed to comply with, including, but not limited to, their obligations under RPC 1.3, 1.7, 1.9, 1.13 and 8.3.

354.    As a direct and proximate result of the professional and legal breaches of the CDQ Defendants, Fresh Mix has sustained substantial damages as described more fully above.

355.    The CDQ Defendants acted in concert with the other Defendants in violating their duties to Fresh Mix for the benefit of their other joint clients.

356.    The conduct of CDQ Defendants is so egregious as to support the award of punitive damages.

**COUNT III**
**(Legal Malpractice)**
**(Fresh Mix v. PB Defendants)**

357.    Fresh Mix repeats, re-alleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

358.    At all relevant times, PB Defendants provided legal representation to numerous parties, including, but not limited to Fresh Mix, GFSI, Caldara, Goldberg, Wise and the affiliated businesses.

359.    An attorney-client relationship existed between Fresh Mix and PB Defendants.

360.    At all relevant times, PB Defendants owed professional duties to Fresh Mix, under the law, rules and standards.

361.    At all relevant times, PB Defendants also represented GFSI in the same matters and proceedings involving the disputes including this matter and the arbitration proceeding in which GFSI, including disputes over allocations of profits and revenues between GFSI and Fresh Mix; notwithstanding the inherent conflicts, PB Defendants continued to represent Fresh Mix and GFSI.

362.    The PB Defendants breached their legal duties to Fresh Mix and aided and abetted

in the planning and implementation of the frauds upon Fresh Mix, including but not limited to the distribution of the assets of Fresh Mix in order to facilitate the instant bankruptcy filing in violation of the Operating Agreement and applicable laws.

363.    In direct breach of their duties to Fresh Mix, the PB Defendants aided and abetted the Defendants in their actions to harm Fresh Mix.

364.    The PB Defendants breached their duty of loyalty to Fresh Mix.

365.    The PB Defendants failed to comply with, including, but not limited to, their obligations under RPC 1.3, 1.7, 1.9, 1.13 and 8.3.

366.     As a direct and proximate result of the professional and legal breaches of the PB Defendants, Fresh Mix has sustained substantial damages as described more fully above.

367.    The PB Defendants acted in concert with the other Defendants in violating their duties to Fresh Mix for the benefit of their other joint clients.

368.    The conduct of PB Defendants is so egregious as to support the award of punitive damages.

**COUNT IV**
**(Legal Malpractice)**
**(Fresh Mix v. BAL Defendants)**

369.    Fresh Mix repeats, re-alleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

370.    At all relevant times, BAL Defendants provided legal representation to numerous parties, including, but not limited to Fresh Mix, GFSI, Caldara, Goldberg, Wise and the affiliated businesses.

371.    An attorney-client relationship existed between Fresh Mix and BAL Defendants.

372.    At all relevant times, BAL Defendants owed professional duties to Fresh Mix,

1   under the law and applicable legal and professional standards.

2        373.    At all relevant times, BAL Defendants also represented GFSI in the same matters

3   and proceedings involving the disputes including this matter and the arbitration proceeding in

4   which GFSI, including disputes over allocations of profits and revenues between GFSI and Fresh

5   Mix; notwithstanding the inherent conflicts, BAL Defendants continued to represent Fresh Mix

6   and GFSI.

7        374.    The BAL Defendants breached their legal duties to Fresh Mix and aided and

8   abetted in the planning and implementation of the frauds upon Fresh Mix, including but not

9   limited to the distribution of the assets of Fresh Mix in order to facilitate the instant bankruptcy

10  filing in violation of the Operating Agreement and applicable laws.

11       375.    In direct breach of their duties to Fresh Mix, the BAL Defendants aided and abetted

12  the Defendants in their actions to harm Fresh Mix.

13       376.    The BAL Defendants breached their duty of loyalty to Fresh Mix.

14       377.    The BAL Defendants failed to comply with, including, but not limited to, their

15  obligations under RPC 1.3, 1.7, 1.9, 1.13 and 8.3.

16       378.     As a direct and proximate result of the professional and legal breaches of the BAL

17  Defendants, Fresh Mix has sustained substantial damages as described more fully above.

18       379.    The BAL Defendants acted in concert with the other Defendants in violating their

19  duties to Fresh Mix for the benefit of their other joint clients.

20       380.    The conduct of BAL Defendants is so egregious as to support the award of punitive

21  damages

22  ///
    ///

1

**COUNT V**
**(Legal Malpractice)**
**(Fresh Mix v. BHFS)**

2

3

4

381.    Fresh Mix repeats, re-alleges, and incorporates all of the allegations contained in

5

the preceding and subsequent paragraphs as though fully set forth herein.

6

382.    At all relevant times, BHFS provided legal representation to numerous parties,

7

including, but not limited to Fresh Mix and GFSI.

8

383.    BHFS worked directly with joint counsel, PB, to gain information, knowledge,

9

legal strategies and understand the PB's (and the other Defendants') joint representation of the Get

10

Fresh parties (which was expressly defined as Get Fresh Sales, Inc. and Fresh Mix, LLC,

11

collectively), to represent the joint clients before Schwartz left BHFS to start his own firm.

12

13

384.    An attorney-client relationship or prospective client relationship existed between

14

Fresh Mix and BHFS.

15

385.    At all relevant times, BHFS Defendants owed professional duties to Fresh Mix,

16

under the law and applicable professional and legal standards.

17

18

386.    At relevant times, BHFS Defendants represented both Fresh Mix and GFSI in the

19

same matters and proceedings involving the disputes including this matter and the arbitration

20

proceeding in which Get Fresh, including disputes over allocations of profits and revenues

21

between GFSI and Fresh Mix.

22

387.    Later, BHFS, having represented Fresh Mix and GFSI, decided to ignore their prior

23

professional and legal obligations to Fresh Mix and decided to negligently or otherwise knowingly

24

notwithstanding the inherent conflicts, represent GFSI against Fresh Mix.

25

26

388.    BHFS breached their legal duties to Fresh Mix and aided and abetted in the

27

planning and implementation of the frauds upon Fresh Mix, including but not limited to the

28

distribution of the assets of Fresh Mix in order to facilitate the instant bankruptcy filing in

1   violation of the Operating Agreement and applicable laws.

2      389.   In direct breach of their duties to Fresh Mix, the BHFS Defendants aided and

3   abetted the adverse parties in their actions to harm Fresh Mix.

4

5      390.   BHFS breached their duty of loyalty to Fresh Mix.

6      391.   BHFS failed to comply with, including, but not limited to, their obligations under

7   RPC 1.18, 1.3, 1.7, 1.9, 1.13 and 8.3.

8      392.   As a direct and proximate result of the professional and legal breaches of BHFS,

9   Fresh Mix has sustained substantial damages as described more fully above.

10      393.   BHFS acted in concert with the other Defendants in violating their duties to Fresh

11   Mix for the benefit of their other joint clients.

12      394.   The conduct of BHFS is so egregious as to support the award of punitive damages.

13

14

15                  **<u>COUNT VI</u>**

16                **(Legal Malpractice)**
              **(Fresh Mix v. SL Defendants)**

17

18      395.   Fresh Mix repeats, re-alleges, and incorporates all of the allegations contained in

19   the preceding and subsequent paragraphs as though fully set forth herein.

20      396.   At all relevant times, prior to establishing SL, Schwartz was a partner at BHFS.

21      397.   Schwartz was the partner who specifically agreed to represent Fresh Mix and GFSI

22   (collectively Get Fresh) in connection with the ongoing litigations in arbitration and state court, as

23   well as, a potential bankruptcy, whether voluntary or otherwise.

24      398.   At BHFS, Schwartz was one of the professionals specifically retained by the

25   aligned group of Get Fresh, as defined in the PB engagement agreement; after all, Schwartz and

26

27   BHFS worked directly with PB to establish the engagement and PB referred to the multiple parties

28   collectively as "Get Fresh".

399.   Notwithstanding Schwartz's prior representation of Fresh Mix while with BHFS, SL and Schwartz sought to circumvent his legal and professional duties improperly through creative drafting of the engagement agreement.  However, Schwartz and SL intended the new engagement to be a continuation of the prior representation.

400.   An attorney-client relationship or prospective client relationship existed between Fresh Mix and Schwartz when he was a partner with BHFS.

401.   At all relevant times, SL Defendants owed professional duties to Fresh Mix, under the law and applicable professional standards.

402.   At relevant times, SL Defendants also represented GFSI in the same matters and proceedings in which SL Defendants had previously represented both Fresh Mix and GFSI; however, now Schwartz intended to represent GFSI against Fresh Mix notwithstanding the professional and legal prohibitions against such negligent, grossly negligent or intentional misconduct, fraud and malice.

403.   SL Defendants breached their legal duties to Fresh Mix and aided and abetted in the planning and implementation of the frauds upon Fresh Mix, including but not limited to the distribution of the assets of Fresh Mix in order to facilitate the instant bankruptcy filing in violation of the Operating Agreement and applicable laws.

404.   In direct breach of their duties to Fresh Mix, the SL Defendants aided and abetted the adverse parties in their actions to harm Fresh Mix.

405.   SL Defendants breached their duty of loyalty to Fresh Mix.

406.   SL Defendants failed to comply with, including, but not limited to, their obligations under RPC 1.18, 1.3, 1.7, 1.9, 1.13 and 8.3.

407.    As a direct and proximate result of the professional and legal breaches of the SL Defendants, Fresh Mix has sustained substantial damages as described more fully above.

408.    SL Defendants acted in concert with the other Defendants in violating their duties to Fresh Mix for the benefit of their other joint clients.

409.    The conduct of SL Defendants is so egregious as to support the award of punitive damages.

**COUNT VII**
**(Legal Malpractice)**
**(Fresh Mix v. All Defendants)**

410.    Fresh Mix repeats, re-alleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

411.    At all relevant times, the Defendants provided legal representation to numerous parties, including, but not limited to Fresh Mix, GFSI, Caldara, Goldberg, Wise and the affiliated businesses.

412.    An attorney-client relationship existed between Fresh Mix and each of the Defendants.

413.    At all relevant times, Defendants owed professional duties to Fresh Mix, under the law and applicable professional and legal standards.

414.    At all relevant times, Defendants also represented GFSI in the same matters and proceedings involving the disputes including this matter and the arbitration proceeding in which Get Fresh, including disputes over allocations of profits and revenues between GFSI and Fresh Mix; notwithstanding the inherent conflicts, the Defendants continued to represent Fresh Mix and GFSI.

415.    The Defendants breached their legal duties to Fresh Mix and aided and abetted in the planning and implementation of the frauds upon Fresh Mix, including but not limited to the distribution of the assets of Fresh Mix in order to facilitate the instant bankruptcy filing in

violation of the Operating Agreement and applicable laws.

416.    In direct breach of their duties to Fresh Mix, the Defendants aided and abetted the Defendants in their actions to harm Fresh Mix.

417.    The Defendants breached their duty of loyalty to Fresh Mix.

418.    The Defendants failed to comply with, including, but not limited to, their obligations under RPC 1.18, 1.3, 1.7, 1.9, 1.13 and 8.3.

419.    As a direct and proximate result of the professional and legal breaches of the Defendants, Fresh Mix has sustained substantial damages as described more fully above.

420.    The Defendants acted in concert with one another for the benefit of GFSI in violation of their legal and legal duties to their client, Fresh Mix.

421.    The Defendants aided and abetted in conduct ultimately undertaken in violation of the Operating Agreement and law and in furtherance of the schemes by All Defendants to harm Fresh Mix.

422.    The actions and conduct of the Defendants, jointly and severally, is so egregious as to warrant the imposition of punitive damages.

**<u>COUNT VIII</u>**
**(Legal Malpractice – Bankruptcy Fraud F.R.B.P. 9011 and 28 U.S.C. §1927)**
**(Fresh Mix v. All Defendants)**

423.    Fresh Mix repeats, re-alleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

424.    At all relevant times, the Defendants provided legal representation to numerous parties, including, but not limited to Fresh Mix, GFSI, Caldara, Goldberg, Wise and the affiliated businesses.

425.    An attorney-client relationship existed between Fresh Mix and each of the

Defendants.

426. At all relevant times, Defendants owed professional duties to Fresh Mix, under the law and applicable professional and legal standards.

427. Defendants are liable for falsifying and orchestrating an abusive bankruptcy filing.

428. The Defendants breached their legal duties to Fresh Mix and aided and abetted in the planning and implementation of the frauds upon Fresh Mix, including but not limited to the distribution of the assets of Fresh Mix in order to facilitate the instant bankruptcy filing in violation of the Operating Agreement and applicable laws.

429. The Defendants did vexatiously multiply the litigation causing unnecessary expense and delay.

430. As a direct and proximate result of the professional and legal breaches of the Defendants, Fresh Mix has sustained substantial damages as described more fully above.

431. The Defendants acted in concert with one another for the benefit of GFSI in violation of their legal and professional duties to their client, Fresh Mix.

432. The Defendants aided and abetted in conduct ultimately undertaken in violation of the Operating Agreement and law and in furtherance of the schemes by All Defendants to harm Fresh Mix.

433. The actions and conduct of the Defendants, jointly and severally, is so egregious as to warrant the imposition of punitive damages.

## COUNT IX
**(Legal Malpractice – Bankruptcy Fraud - Bad Faith Sanctions)**
**(Fresh Mix v. All Defendants)**

434. Fresh Mix repeats, re-alleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

435. On January 22, 2024, the involuntary bankruptcy was dismissed as an abuse of

process such that the compensatory and punitive damages under 11 USC §303(i)(1) and (2)(A) and (2)(B) may be applicable.

436.    An attorney-client relationship existed between Fresh Mix and each of the Defendants.

437.    At all relevant times, Defendants owed professional duties to Fresh Mix, under the law and applicable professional standards.

438.    Defendants are liable for falsifying and orchestrating an abusive bankruptcy filing.

439.    The Defendants breached their legal duties to Fresh Mix and aided and abetted in the planning and implementation of the frauds upon Fresh Mix, including but not limited to the distribution of the assets of Fresh Mix in order to facilitate the instant bankruptcy filing in violation of the Operating Agreement and applicable laws.

440.    As a direct and proximate result of the Defendants' breaches of duties owed to Fresh Mix, Fresh Mix has sustained substantial damages as described more fully above.

441.    The Defendants acted in concert with one another for the benefit of GFSI in violation of their legal and professional duties to their client, Fresh Mix.

442.    The Defendants aided and abetted in conduct ultimately undertaken in violation of the Operating Agreement and law and in furtherance of the schemes by All Defendants to harm Fresh Mix.

443.    The actions and conduct of the Defendants, jointly and severally, is so egregious as to warrant the imposition of punitive damages.

///
///
///

1

**COUNT X**
**(Federal Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**18 U.S.C. §1962(c)**
**(Fresh Mix v. All Defendants)**

444.    Fresh Mix repeats, re-alleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

445.    The Defendants and their co-conspirators unlawfully, willfully and knowingly and for purposes of executing and attempting to execute the scheme and artifice to defraud and damage Plaintiff through the conduct and participation in the enterprise through a pattern of racketeering, did inflict serious harm and damages upon Plaintiff.

446.    By reason of the foregoing, Plaintiff is entitled to recover from the Defendants, jointly and severally, threefold its actual damages as the Court finds Plaintiff has been damaged, together with costs of suit, reasonable attorneys' fees and any other amounts allowed under the law.

**COUNT XI**
**(Federal Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**18 U.S.C. §1962(d)**
**(Fresh Mix v. All Defendants)**

447.    Fresh Mix repeats, re-alleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

448.    The Defendants and their co-conspirators unlawfully, willfully and knowingly and for purposes of executing and attempting to execute the scheme and artifice to defraud and damage Plaintiff through the conduct and participation in the enterprise through a pattern of racketeering, did inflict serious harm and damages upon Plaintiff.

449.    By reason of the foregoing, Plaintiff is entitled to recover from the Defendants, jointly and severally, threefold its actual damages as the Court finds Plaintiff has been damaged,

1  together with costs of suit, reasonable attorneys' fees and any other amounts allowed under the

2  law.

3

4                            **PRAYER FOR RELIEF**

5  WHEREFORE, Fresh Mix prays for judgment as follows:

6

7       1. For temporary and permanent injunctive relief;

8       2. For compensatory and special damages, including attorneys' fees to be determined at

9  trial;

10      3. For punitive damages in an amount to be determined at trial;

11      4. For prejudgment and post-judgment interest at the highest rate permitted by law;

12      5.  For attorneys' fees and costs of suit herein, as allowed by law, in an amount to be

13  determined; and

14      6. Any additional relief this Court deems just and proper, including, but not limited to

15

16  punitive damages.

17                            **<u>JURY DEMAND</u>**

18      Plaintiff hereby demands this case be tried by a Jury as provided for by law and the

19  Constitution.

20              DATED this 27th day of February, 2024.

21

22                        MATTHEW L. SHARP, LTD.

23              By:    /s/ Matthew Sharp
                       Matthew Sharp, Esq.
24                     Nevada Bar No. 4746
                       432 Ridge St.
25                     Reno, NV 89502
                       matt@mattsharplaw.com
26

27

28

1

2
                                        Stern & Eisenberg, PC

3
                              By:    /s/ Steven K. Eisenberg (Pro Hac Vice Pending)
4                                    Steven K. Eisenberg, Esq.
                                     1581 Main Street, Suite 200
5                                    Warrington, Pennsylvania 18976
                                     seisenberg@sterneisenberg.com
6

7                                    *Attorneys for Plaintiff, Fresh Mix LLC*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28